**F I L E D**

PUBLISH

**March 9, 2006**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

RONALD F. VAN SCOTEN;
CYNTHIA G. VAN SCOTEN,

    Petitioners - Appellants,

vs.

COMMISSIONER OF INTERNAL
REVENUE,

    Respondent - Appellee.

No. 05-9000

---

**APPEAL FROM THE UNITED STATES TAX COURT**
**(T.C. No. 24946-96)**

---

Terri A. Merriam (and Wendy S. Pearson, Pearson & Merriam, P.C, with her on
the briefs), Seattle, Washington, for Petitioners - Appellants.

Anthony T. Sheehan (and Bruce R. Ellisen, Tax Division, Department of Justice,
and Eileen J. O'Connor, Assistant Attorney General, on the brief), Washington,
D.C., for Respondent - Appellee.

---

Before **KELLY**, **HENRY**, and **McCONNELL**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

    Taxpayer-Appellants Ronald and Cynthia Van Scoten (collectively, the

"Van Scotens") appeal from the Tax Court's decision in <u>Van Scoten v.</u> <u>Commissioner</u>, T.C. Memo. 2004-275, 2004 WL 2785918 (2004) ("<u>T.C. Memo</u>"), holding them liable for an accuracy-related penalty of $2,872 imposed by the Commissioner of Internal Revenue ("Commissioner") as a result of their negligence in claiming losses from a cattle partnership they were invested in during the 1991 tax year. Our jurisdiction arises under 26 U.S.C. § 7482(a)(1), and we affirm.

## Background

The accuracy-related penalty at issue in this case arises from adjustments of partnership items on the Van Scotens' 1991 Federal income tax return. The adjustments are the result of the Van Scotens' investment in a partnership organized and promoted by Walter J. Hoyt III ("Mr. Hoyt").

### I. *Mr. Hoyt and the Hoyt Organization*

Mr. Hoyt's father was a nationally recognized breeder of shorthorn cattle, one of the three major breeds of cattle in the United States. In order to expand his business and attract investors, Mr. Hoyt's father, in the late 1960s, began organizing and promoting cattle breeding partnerships. Before and after his father's death in 1972, Mr. Hoyt and other members of his family were also extensively involved in these activities.

From approximately 1971 to 1998, Mr. Hoyt organized, promoted, and operated as a general partner more than 100 cattle breeding partnerships (collectively, the "Hoyt partnerships" or "Hoyt organization"). He promoted the Hoyt partnerships as a way for investors to realize tax savings as the partnerships' herds grew and eventually profit when the herds were liquidated. Over the years, however, the partnerships outgrew the number of available animals, and Mr. Hoyt generated the promised tax benefits by creating "phantom" animals and overvaluing existing animals.

Mr. Hoyt controlled all aspects of the partnerships. In addition to managing each partnership as general partner, beginning in 1983, and until removed due to a criminal conviction, Mr. Hoyt served as each partnership's tax matters partner. He was responsible for and directed the preparation of each partnership's tax return, typically signing and filing them himself. Mr. Hoyt also prepared most of the partners' individual tax returns during the years of their investments through various tax preparation companies he operated. From approximately 1980 to 1997, Mr. Hoyt was a licensed enrolled agent, and as such he represented many of the partners before the Internal Revenue Service ("IRS") until he was disenrolled in 1998.

Starting in 1993, after a cattle count, the Commissioner generally froze and stopped issuing income tax refunds to investors in the Hoyt partnerships. The

IRS issued pre-filing notices to investors advising them that, starting with the 1992 taxable year, the IRS would disallow the tax benefits claimed on their individual returns attributable to the Hoyt partnerships and would not issue refunds based thereon.

Mr. Hoyt and others were eventually indicted for federal offenses relating to their involvement in the Hoyt partnerships. Mr. Hoyt was convicted on all 52 counts brought against him, including fraud and conspiracy, but not tax fraud. As part of his sentence he was required to pay restitution in the amount of $102 million—the amount that was paid to the Hoyt organization from 1982 through 1998 by investors in various Hoyt partnerships.

## II. *The Van Scotens and Their Investment*

Mr. Van Scoten has an associate's degree in electricity and Mrs. Van Scoten completed one year of college. During the year in issue, Mr. Van Scoten worked as an equipment salesman, and Mrs. Van Scoten worked as a respiratory therapist.

The Van Scotens first learned of the Hoyt partnerships in 1988 from Mr. Van Scoten's father, Edward Van Scoten ("Edward"). Edward has a bachelor's degree. He served in the Air Force for approximately 21 years, after which time he taught at a community college and worked for an electronics corporation. He had limited experience with dairy farms—he spent his childhood living on or near

dairy farms, and as a teenager and for one year, during his Air Force career, he worked on a dairy farm. He also had some investment experience with mutual funds, employee profit sharing, insurance, and real estate.

Edward invested in a Hoyt partnership in December 1983. He first learned about the Hoyt organization from his nephew, who had already invested in a Hoyt partnership. In making his own investment, Edward relied upon information obtained from his nephew and the Hoyt organization. He did not seek outside advice, such as advice from an independent investment or tax advisor. After making his investment, Edward spent one summer working on a Hoyt ranch where he drove a truck hauling hay bales. He also attended monthly Hoyt partnership meetings over a period of several years starting in the early 1990s.

Before investing, Mr. Van Scoten spoke to Edward about the Hoyt partnerships on a regular basis.[1] His father told him that:

> the partnership involved cattle; in particular, what [Edward] called 'Borrow-A-Bull.' That entailed investing money into the partnership, buying what I presumed was a percentage of a group of cattle, and from there, after a number of years or after the initial investment, then we would receive a return on our investment.

I Tr. at 29. Edward also told him that he had seen cattle and numerous trucks bearing the Walter J. Hoyt logo and insignia. When asked by his son whether the

---

[1] While the record is clear that Mrs. Van Scoten was an investor in the Hoyt partnership, because she did not testify at trial there is no evidence in the record with respect to her understanding of the investment or her decision to invest.

investment made sense, Edward responded that it did.  Mr. Van Scoten trusted his father's advice.

Prior to investing, the Van Scotens received various promotional materials prepared by the Hoyt organization.  The Van Scotens relied on these promotional materials which, in general, provided rationales for why the partnerships were good investments and why the purported tax savings were legitimate.

One document on which the Van Scotens relied, entitled "Hoyt and Sons–The 1,000 1b. Tax Shelter," provided information concerning the Hoyt partnerships and how they would provide profits to investors over time.  The document emphasized that the primary return on an investment in a Hoyt partnership would be from tax savings and refunds, but that the U.S. Congress had enacted the tax laws to encourage investment in partnerships such as those promoted by Mr. Hoyt.  The document stated that an "investment in cattle [is arranged] so the cash required to keep it going is only about seventy five percent" of an investor's tax savings, while the other twenty-five percent of the tax savings is "a thirty percent cash return." R. Ex. 407-P at 15.  That is, partners were required to remit seventy-five percent of the Federal tax refunds they received to the Hoyt organization and were permitted to retain the remaining twenty-five percent.  This arrangement purportedly provided protection to investors: "If the cows do die and the sky falls in, you have still made a 30% cash return, and no

matter what happens, you are always better off than if you had paid the money in taxes." Id.

A section of the document that was devoted to a discussion of audits by the IRS stated that the partnerships would be "branded as a potential 'abuse' by the Internal Revenue Service" and will be subject to "automatic audit." Id. at 80. In a section of the document titled "Tax Aspects," the following "warning" was given:

> If you must have a tax man give you specific personal advice as to whether or not you belong in the cattle business, stay out. . . . Don't have anything to do with any aspect of the cattle business without having a good tax pro working with you all the time, and don't waste much time trying to learn tax law from a Partnership Memorandum.

Id. at 57.

The document then dedicated numerous pages to explaining the tax benefits of investing in a Hoyt partnership and why investors should trust only Mr. Hoyt's organization to prepare their individual tax returns. Among these benefits, the document explained: "If a Partner needs more or less Partnership loss to be special [sic] allocated to him for any year, it is arranged quickly within the same office, without the Partner having to pay a higher fee while an outside preparer spends more time to make the arrangements." Id. at 79. Finally, the document warned that there remained a chance that "[a] change in tax laws or an audit and disallowance by the IRS could take away all or part of the tax benefits, plus the

possibility of having to pay the tax along with penalties and interest." Id. at 39.

Before investing, Mr. Van Scoten also received from the Hoyt organization a copy of the Tax Court's opinion in Bales v. Commissioner, 58 T.C.M. (CCH) 431, 1989 WL 123005 (1989). Bales involved deficiencies asserted against various partnerships marketed by Mr. Hoyt. The Tax Court found in favor of the investors on all issues, concluding that "the transaction in issue should be respected for Federal income tax purposes." Id. Mr. Hoyt touted the Bales opinion as proof that the Hoyt partnerships were legal, and that the IRS was incorrect in challenging their tax claims. Mr. Van Scoten testified that he understood the Bales opinion to mean "basically, that a partnership either similar to ours or like it was [sic] it had gone to court and the Bales had won the case. As far as the details about it, I don't know." I Tr. at 30.

Mr. Van Scoten had no experience in cattle ranching or investing. Despite this, he did not personally investigate the Hoyt partnerships or consult with competent independent professionals—for example, he did not consult with cattle ranchers, independent investment consultants or independent tax advisers—concerning the legitimacy of the business or the accuracy of the tax benefits being touted. Rather, Mr. Van Scoten relied on the advice of his father and the information he received from the Hoyt organization before investing.

On January 7, 1991,[2] the Van Scotens signed several documents in order to invest in a Hoyt partnership known as Durham Shorthorn Breed Syndicate 1987-C ("DSBS 87-C").[3] Included in these documents were various power of attorney forms, which authorized Mr. Hoyt to act on the Van Scotens' behalf for practically all DSBS 87-C matters. One particular power of attorney granted Mr. Hoyt the authority to sign recourse promissory notes on the Van Scotens' behalf.

When Mr. Van Scoten signed the various partnership documents and power of attorney forms, he believed that they would be required to repay the recourse promissory notes signed on their behalf by Mr. Hoyt. He also believed the investment would produce a profit and provide retirement income.

The Van Scotens made substantial cash payments to the Hoyt organization during the years 1991 through 1997. In a summary of such payments prepared by the Van Scotens, they estimate that the total amount of these payments exceeds $40,000. These payments included the remittance of their tax refunds, the

---

[2] Although Mr. Van Scoten testified at trial that "I believe the first year we invested" was 1990, the Tax Court found, and the record reveals, that the investment was in fact made in January 1991.

[3] Partnerships like the DSBS 87-C were actually supposed to earn a profit by raising a herd of female breeding cows whereas the borrow-a-bull partnerships were supposed to earn a profit by leasing bulls to third-party ranchers. See Durham Farms #1, 79 T.C.M. (CCH) 2009, aff'd, 59 Fed. Appx. 952 (9th Cir. 2003). The record provides no indication that the Van Scotens were aware that they joined a partnership that operated on a different business model than the borrow-a-bull partnership recommended by Edward.

payment of quarterly and monthly installments on their promissory notes (even after they stopped receiving refunds from the Commissioner), special "assessments" imposed by the partnership, and contributions to purported individual retirement account plans maintained by the Hoyt organization.

During and after the year in issue, the Van Scotens received numerous documents purporting to show both the legitimacy of the Hoyt partnerships and the legality of the tax claims being made by the Hoyt organization. The Van Scotens trusted these documents and believed and relied upon what the Hoyt organization told them.

III. *The Van Scotens' Federal Tax Claims and the Instant Litigation*

On June 10, 1991, the Van Scotens filed a joint Federal income tax return for 1990, on which they reported the following:

| | |
|---|---|
| Wage income | $46,162 |
| Interest income | 29 |
| Pension and annuity income | 8,422 |
| Loss from DSBS 87-C | (148,390) |
| IRA contribution | (2,000) |
| Adjusted gross income | (95,777) |
| Tax liability | 842 |
| Overpayment | 3,771 |

R. Ex. 24-R.

Upon filing their 1990 return, the Van Scotens also filed a Form 1045,

- 10 -

Application for Tentative Refund.  On this form, the Van Scotens claimed a loss

carry-back from 1990 in the amount of $102,228.  The Van Scotens reported the

following after application of the loss carry-back to the respective taxable years:

|  | 1987 | 1988 | 1989 |
| --- | --- | --- | --- |
| AGI on return | $49,726 | $38,967 | $40,889 |
| Tax liability on return | 5,949 | 3,529 | 3,549 |
| Correct tax liability | -0- | -0- | -0- |
| Overpayment | 5,949 | 3,529 | 3,549 |

R. Ex. 24-R.

As planned, the 1990 return and the Form 1045 were prepared by

individuals affiliated with the Hoyt organization.  The refund and tentative

refunds requested by the Van Scotens with respect to the 1990 return and the

carry-back years totaled $16,798.  The Van Scotens remitted two payments to the

Hoyt organization during 1991 in the amounts of $7,000 and $9,750.

In January 1992, before the Van Scotens signed their 1991 return, the

Commissioner mailed Hoyt investors, including the Van Scotens, a letter

regarding the application of 26 U.S.C. § 469 (relating to passive activity loss

limitations).[4]  That same month, Mr. Hoyt mailed a letter to investors, including

---

[4] As part of the Tax Reform Act of 1986, 26 U.S.C § 469 was enacted. Section 469 was intended to limit the financial incentive to structure traditional tax shelters.  Prior to this enactment, taxpayers could use passive activity losses to offset non-passive activity income, thereby sheltering active income from taxation.  Now, however, § 469 generally prohibits the deduction of passive

the Van Scotens, setting forth arguments that Hoyt investors materially participated in their partnerships within the meaning of § 469. In this letter, Mr. Hoyt stated that the Commissioner's assertions in the preceding letter were incorrect, and that the investors should do what was necessary to participate in their investment at least 100 or 500 hours per year, depending upon the circumstances, in order to meet § 469 requirements. Mr. Hoyt stated that the time investors spent in recruiting new investors, as well as "reading and thinking about these letters," would count toward the material participation hourly requirements. R. Ex. 480-P. Finally, in this letter Mr. Hoyt emphasized that "[t]he position of your partnership is that it is not a tax shelter," because tax shelters "are never recognized for Federal income tax purposes." Id.

By letter dated February 11, 1992, the Commissioner replied to the assertions made by Mr. Hoyt. The Commissioner explained that: Mr. Hoyt's letter contained "misleading and/or inaccurate premises"; Mr. Hoyt was relying on

---

activity losses, except insofar as the losses are used to offset passive activity income. Section 469(c)(1) defines a passive activity as "any activity (A) which involves the conduct of any trade or business, and (B) in which the taxpayer does not materially participate." As used here, the term "material participation" connotes a determination of whether, based on all the facts and circumstances, a taxpayer participates in the activity on a regular, continuous, and substantial basis during the taxable year. See Temp. Treas. Reg. § 1.469-5T(a)(7). In order to qualify, the taxpayer must first show that he participated in the activity for more that 100 hours during the tax year. See id. § 1.469- 5T(b)(2)(iii). Regulation 1.469-5T(f)(2)(ii) defines investors' activities that are not considered in meeting the hourly requirement.

provisions that Treas. Reg. § 1.269-5T(b)(2) "specifically excluded from being taken into account"; "[c]ontrary to Mr. Hoyt's statement, time spent reading and thinking about issues should not be considered as material participation hours for 1992"; and confused partners should consult with an independent accountant or attorney. R. Ex. 17-R at 2. The Commissioner also attached to its letter excerpts from Treas. Reg. § 1.269-5T(f)(2)(ii) specifically stating that work done by individuals as investors, e.g., studying and analyzing financial statements and considering proposals from the day-to-day managers, did not count towards the material participation requirements. Id. at 3-4.

In addition to the above correspondence, the Van Scotens received a letter dated February 3, 1992 that informed them that the Commissioner was beginning an examination of DSBS 87-C with respect to its taxable year ending in 1990. When the Van Scotens received any correspondence from the Commissioner, they mailed or faxed copies to the Hoyt organization but neither took further action nor sought independent advice concerning the information they received.

The Van Scotens filed a joint Federal income tax return for taxable year 1991, the year in issue, reporting the following:

| | |
|---|---|
| Wage income | $51,362 |
| Interest income | 71 |
| State tax refunds | 1,433 |
| Loss from DSBS 87-C | (45,510) |

| | |
|---|---|
| Farm income | 22,199 |
| IRA contribution | (2,000) |
| Self-employment tax deduction | (240) |
| Adjusted gross income | 27,315 |
| Tax liability | 1,798 |
| Overpayment | 2,471 |

R. Ex. 1-J at 2, 4.

A statement included with the return, separately signed by the Van Scotens, represented that the Van Scotens materially participated in DSBS 87-C activities. On the blank line following "[t]he numbers [sic] of hours we spent working in our business activity in 1991 was," the Van Scotens filled in "all that was needed to be done." Id. at 3. The 1991 return was prepared by one of Mr. Hoyt's tax preparation services and was signed by Mr. Hoyt on April 10, 1992. The Van Scotens signed the return on April 14, 1992.

Mr. Van Scoten did not know how the Hoyt partnership related items were derived; he knew only that Mr. Hoyt or a member of his organization had entered the items on the returns. He assumed the items were correct. Mr. Van Scoten did not question the amounts shown on the return, and the Van Scotens did not have the returns checked by an independent tax advisor before signing them. The Van Scotens remitted two payments to the Hoyt organization during 1992 in the amounts of $3,000 and $1,250.

Following the 1993 cattle count, on May 1, 1995, the Commissioner issued a Notice of Final Partnership Administrative Adjustment ("FPAA") to the Van Scotens with respect to DSBS 87-C that reflected the disallowance of various deductions claimed on the partnership's return for the 1991 taxable year. Because a timely petition to the Tax Court was not filed in response to the FPAA issued for DSBS 87-C, the Commissioner made a computational adjustment against all DSBS 87-C partners with respect to the FPAA. The computational adjustments changed the Van Scotens' 1991 claimed DSBS 87-C loss of $45,510 to income of $4,998 and disallowed the Hoyt partnership-related IRA contribution deduction of $2,000, resulting in additional computational adjustments to the Van Scotens' itemized deductions and self-employment tax deduction. This changed the Van Scotens' 1991 tax liability to $16,479, an increase of $14,681 above the Van Scotens' reported tax liability of $1,798.

The Commissioner also determined that $14,359 of the underpayment resulting from the DSBS 87-C computational adjustment was due to the Van Scotens' negligence in claiming the $45,510 DSBS 87-C loss. Consequently, pursuant to I.R.C. § 6662(a), the Commissioner assessed an accuracy-related penalty of $2,872.

The Van Scotens petitioned the Tax Court for a redetermination of the § 6662(a) penalty assessed by the Commissioner. After a trial, the Tax Court

entered a final decision for the Commissioner, sustaining its negligence determination and rejecting the Van Scotens' argument that they should be relieved from paying a penalty because they showed reasonable cause and acted in good faith in claiming the DSBS 87-C loss.

On appeal, the Van Scotens argue that the Tax Court erred in upholding the Commissioner's negligence determination for the following reasons: (1) it failed to consider numerous relevant and undisputed facts favorable to them; (2) they were not negligent because they reasonably relied on the advice of Mr. Hoyt, his organization's tax professionals, and Edward; (3) they were not negligent because they reasonably relied on the <u>Bales</u> decision; (4) they were not negligent because they actively monitored their investment; (5) the Tax Court applied an improper negligence standard; (6) it improperly determined that the Hoyt partnerships were abusive tax shelters; and (7) Mr. Hoyt's fraud caused them to have an honest misunderstanding of fact.

**Discussion**

We review Tax Court decisions "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." 26 U.S.C. § 7482(a)(1). "'Thus, we review factual questions for clear error, legal questions de novo, and mixed questions of law and fact either for clear error or de novo,

- 16 -

depending on whether the question is primarily factual or legal.'" IHC Health

Plans, Inc. v. Comm'r, 325 F.3d 1188, 1193 (10th Cir. 2003). We review de novo

findings of "ultimate fact derived from applying legal principles to subsidiary

facts." Consolidated Mfg., Inc. v. Comm'r, 249 F.3d 1231, 1236 (10th Cir. 2001)

(quotation omitted).

## I. *Accuracy-related Penalty for Negligence Under I.R.C. § 6662(a)*

The Tax Code imposes an addition to tax of 20 percent on the portion of an

underpayment attributable to, among other things, "negligence or disregard of

rules or regulations." I.R.C. § 6662(a), (b)(1); Treas. Reg. § 1.6662-3.

"Negligence" includes any failure to make a reasonable attempt to comply with

the provisions of the tax law. I.R.C. § 6662(c). Negligence is defined as the

"lack of due care or failure to do what a reasonable or ordinarily prudent person

would do under the circumstances." Anderson v. Comm'r, 62 F.3d 1266, 1271

(10th Cir. 1995) (defining "negligence" for the purposes of I.R.C. § 6653(a)(1),

the predecessor negligence statute to § 6662(b)(1)). Courts generally look to both

the underlying investment and to the taxpayer's position taken on the return in

evaluating whether a taxpayer was negligent. See id. at 1272-73. "The

Commissioner's determination of negligence is presumed correct, and the

taxpayer has the burden of proving it wrong." Id. at 1271.[5]

## II. *Undisputed and Favorable Facts Allegedly Omitted*

As a preliminary matter, the Van Scotens contend that the Tax Court omitted numerous relevant and undisputed facts favorable to them in reaching its negligence determination. We may reverse a Tax Court's factual findings for clear error when it fails to consider relevant, contrary and undisputed evidence that is material. See Sather v. Comm'r, 251 F.3d 1168, 1178 (8th Cir. 2001) (reversing Tax Court for declining to consider pertinent facts establishing reasonable cause exception under I.R.C. § 6664(c)). Our review of the T.C. Memo and record reveal that the Tax Court did not disregard any relevant, undisputed and material evidence favorable to the Van Scotens; it just accorded the evidence different weight than the Van Scotens do and drew different conclusions. It was up to the Tax Court, as the trier of fact, to decide what weight to give the undisputed evidence and what inferences to draw in the first instance. See Anderson, 62 F.3d at 1270 n.8.

## III. *Reliance on Mr. Hoyt, His Organization's Tax Professionals, and Edward*

The Van Scotens argue first that the negligence penalty should not apply

---

[5] While I.R.C. § 7491 shifts the burden of production and/or proof to the Commissioner in certain circumstances, § 7491 does not apply here because the Commissioners examination of the Van Scotens' 1991 return did not commence after July 22, 1998. See Internal Revenue Restructuring and Reform Act, Pub. L. 105-206, July 22, 1998, 112 Stat. 685, 727.

because they acted reasonably in relying on Mr. Hoyt for their tax reporting obligations. Rejecting this argument, the Tax Court held that such reliance was not objectively reasonable because Mr. Hoyt and his organization created and promoted DSBS 87-C, completed the Van Scotens' tax return, and received the bulk of the tax benefits from doing so. The Van Scotens challenge this finding because it ignores the unique circumstances of this case, emphasizing Mr. Hoyt's status as an enrolled agent, his success in litigating the Bales case, and his first hand knowledge of the partnership's financial and tax affairs.

Reliance on professional advice can, in certain circumstances, provide a defense to a negligence penalty. See Mauerman v. Comm'r, 22 F.3d 1001, 1006 (10th Cir. 1994) (superseded on other grounds); Illes v. Comm'r, 982 F.2d 163, 166 (6th Cir. 1992); Heasley v. Comm'r, 902 F.2d 380, 384 (5th Cir. 1990); Treas. Reg. § 1.6664-4(c). However, reliance on such advice must be reasonable. See United States v. Boyle, 469 U.S. 241, 250 (1985) (holding taxpayer's reliance on attorney to file timely return was not reasonable under § 6651). To be reasonable, the professional adviser cannot be directly affiliated with the promoter; instead, he must be more independent. See Golman v. Comm'r, 39 F.3d 402, 408 (2nd Cir. 1994) (finding taxpayers' reliance on accountant who was also a sales representative for investment unreasonable because of inherent conflict of interest); Pasternak v. Comm'r, 990 F.2d 893, 903 (6th Cir. 1993)

- 19 -

(finding reliance on promoters or their agents unreasonable because such persons are not independent of the investment); cf. Anderson, 62 F.3d at 1271 (finding taxpayer's reliance on an advisor who was an independent insurance agent and registered securities broker not unreasonable because the commission paid by taxpayer to the advisor, who was not affiliated with the investment, did not jeopardize the advisor's independence).

The Van Scotens' reliance on the advice of Mr. Hoyt was not reasonable. As the Tax Court found, Mr. Hoyt and his organization created and promoted the partnership, completed the Van Scotens' tax return, and received the bulk of the tax benefits from doing so. While Mr. Hoyt's status as an enrolled agent during the tax year at issue, his success in the Bales case, and his knowledge of the financial affairs of the partnership may speak to his professional competency, such facts do not alter the conclusion that he lacked the independence necessary to allow the Van Scotens to reasonably rely on his advice. Accordingly, the Tax Court correctly determined that the Van Scotens' reliance on Mr. Hoyt was unreasonable.

The Van Scotens argue next that they acted reasonably in relying on the tax professionals hired by Mr. Hoyt and his organization. The Tax Court found that the Van Scotens failed to establish in what manner they personally relied upon these professionals or even the details of what advice the professionals provided

that would be applicable to their situation regarding the tax year at issue. The

Tax Court also found that because the tax professionals were affiliated with the

Hoyt organization, any such reliance would be unreasonable. The Van Scotens

argue that this finding was in error because, in light of their lack of

sophistication, it was not unreasonable for them to believe that the tax

professionals retained by the Hoyt organization represented their specific

interests. This argument is not persuasive. Regardless of their level of

sophistication, it was unreasonable for the Van Scotens to rely on tax

professionals that they did not personally consult with, explain their unique

situation to, or receive formal advice from. Further, the tax professionals were

agents of Mr. Hoyt and his organization. Thus, even if such advice were

forthcoming, the Van Scotens could not reasonably rely on it. See Pasternak, 990

F.2d at 903 (finding reliance on promoters or their agents unreasonable).

Last, the Van Scotens argue that it was reasonable for them to rely on

Edward's personal knowledge and experience regarding the merits of their

investment. The Tax Court rejected this argument, finding that Edward lacked the

expertise necessary to provide objectively reasonable advice concerning an

investment in a Hoyt partnership. The Van Scotens maintain that the Tax Court

applied too stringent of a standard to their reliance on Edward because in

Anderson this court held that "one does not have to be an expert in an industry

before he can invest in the industry himself or recommend an investment to another." 62 F.3d at 1271.

We agree with the Van Scotens that, to the extent the Tax Court found their reliance on Edward's advice unreasonable because he was not an expert in the cattle industry, that finding is inconsistent with Anderson. We disagree, however, that Anderson supports their reliance on Edward here. The advisor in Anderson was the taxpayer's investment advisor who performed a far more thorough investigation of the business at issue than that performed by Edward. For example, the advisor in Anderson had his accountant and attorney review the business and check out its structure. Id. He spoke with the business's principal and looked into his background by checking his references, banks, other business connections and the Better Business Bureau. Id. The advisor also checked with other companies in the industry to ensure that the business could be competitive based on its purported assumptions. Id.

Here, on the other hand, Edward's investigation of the Hoyt partnerships was mostly limited to his review of the fairly generalized information he received from the Hoyt organization and his nephew. He did not seek advice from an independent professional such as an attorney or an accountant. To be sure, Edward had some experience with the cattle industry through living and working on dairy farms and he also had some investing experience, but such experiences

certainly cannot substitute for his rather anemic investigation of the Hoyt partnerships. The Van Scotens reliance on Edward was not, therefore, reasonable.[6]

## IV. *The Bales decision*

Throughout their brief, the Van Scotens argue that the negligence penalty should not apply because they acted reasonably in relying on the Tax Court's decision in <u>Bales</u> as a basis for claiming the DSBS 87-C loss. In rejecting this argument, the Tax Court started by noting that the <u>Bales</u> case involved different investors, different partnerships, different taxable years, and different issues than those underlying the present case. It went on to find that the Van Scotens did not establish that they relied on <u>Bales</u> in claiming the DSBS 87-C loss. It concluded instead that if the Van Scotens relied on <u>Bales</u> to any degree, they relied on the interpretation of it provided by Mr. Hoyt and his organization, which it found to

---

[6] The Van Scotens also take issue with the Tax Court's conclusion that the Van Scotens "placed their trust entirely with the Hoyt organization, and they did not investigate the legitimacy of the partnerships with anyone not employed by or invested in the Hoyt organization." <u>T.C. Memo</u> at 23. They contend that this statement indicates that the Tax Court found their reliance on Edward to be unreasonable because he was invested in the Hoyt partnerships. This reading misconstrues the analysis of the Tax Court. The Tax Court rejected their reliance on Edward for the reasons discussed. Its statement relating to those "invested in the Hoyt organization" was made in reference to its conclusion that the investors upon which the Van Scotens allegedly relied, namely Edward, made their investment decision primarily on the information received from the Hoyt organization. The Tax Court did not, as the Van Scotens suggest, dismiss their reliance on Edward merely because he was an investor.

be objectively unreasonable.

The Van Scotens first argue that the Tax Court's observed differences between the Bales case and the current litigation "not only ignores fundamental principles of *stare decisis*, but imposes a burden on [them] that is completely unreasonable, especially given their lack of sophistication in tax matters." Aplt. Br. at 33. They maintain that because Bales addressed essentially identical partnerships operated and promoted in the same manner as DSBS 87-C, it was not unreasonable for Mr. Van Scoten to form his belief that the Tax Court validated the legitimacy of the Hoyt partnerships and the tax position taken by them.

Reference to the lengthy Bales opinion reveals some noticeable differences between the issues involved therein and the positions taken by the Van Scotens in the 1991 tax year. See Aplee. Br. at 48-49. Moreover, Bales was hardly the last word on the subject given the aggressive pursuit by the IRS publicized by Mr. Hoyt. We need not catalog those differences or repeat that history, however, because we find that the Tax Court was not clearly erroneous in its factual determination that Mr. Van Scoten did not personally rely on Bales but relied instead on the Hoyt organization's interpretation of it. At trial, Mr. Van Scoten testified that his understanding of Bales was that a partnership either similar to his or like it had been unsuccessfully challenged in the Tax Court. See I Tr. at 30. Yet, his trial testimony also establishes that he did not read the entire Bales

opinion, know the partnerships involved, or have an independent professional review it with him. Id. at 109-10. Instead, when asked by his counsel why he thought Bales had relevance to him, he responded in reference to the Hoyt organization's interpretation of it. See id. at 129. Based on this record, we cannot conclude that the Tax Court's determination was clearly erroneous.

The Van Scotens argue next that they need not have known every detail of the Bales opinion to have reasonably relied on it because they obtained professional advice from Mr. Hoyt as to its application to their own tax reporting positions. They further maintain that the Tax Court was in error to conclude that such reliance was objectively unreasonable, again emphasizing Mr. Hoyt's role as an enrolled agent and his success in the Bales case. As discussed, we have already determined that the Tax Court did not err in determining that the Van Scotens' reliance on Mr. Hoyt was unreasonable. We need not revisit that holding.

Last, the Van Scotens argue that a significant omission from the Tax Court's finding as to the applicability of Bales in its negligence determination is the Commissioner's own determination that investor reliance on Bales was not unexpected or unreasonable. The finding in question appeared in an Appeals Transmittal and Case Memo ("Appeals Memo"). The Appeals Memo was prepared by an IRS Appeals Officer in 1997 when reviewing, among other things,

whether to impose a negligence penalty on investors in a Hoyt partnership. In the

Appeals Memo, the Appeals Officer stated:

> Bales seemed to affirm the propriety of most of the Hoyt programs . .
> . . I would suggest that the taxpayers involved in Hoyt's program
> have learned a great deal during our recent dealings with them, that
> many of them are still confused about who—the IRS or Hoyt— is
> telling them the whole truth; and that they are anxious to comply
> with the tax laws, if they can just figure out what compliance means.
> And . . . the Tax Court's decision in Bales has only added to the
> investor's confusion.

R. Ex. 502-P at 26-27.

It is not at all surprising that the Tax Court did not mention the Appeals

Memo in its negligence analysis given its conclusions that the Van Scotens did

not personally rely on the Bales opinion and that their reliance on Mr. Hoyt's

interpretation thereof was unreasonable.[7] The Tax Court did not, therefore, err in

omitting a discussion of the Appeals Memo from its negligence determination.[8]

## V. *The Van Scotens' Investment Monitoring Efforts*

---

[7] We are also unpersuaded that the position taken in the Appeals Memo supports the Van Scotens' contention. The determination of whether a taxpayer was negligent in failing to make a reasonable attempt to comply with the provisions of the tax laws is made with respect to the taxpayers actions as of the time of filing. See, e.g., Friedman v. Comm'r, 53 F.3d 523, 529 (2d Cir. 1995) (noting that whether a claim is grossly erroneous under § 6013(e)(2) must be evaluated as of the time of filing of the tax return).

[8] To the extent the Van Scotens argue that the Appeals Memo further bolsters the credibility and persuasiveness of Mr. Hoyt's explanation regarding the applicability of Bales to the positions they took on their 1991 tax return, it does not change our determination that their reliance on his advice was unreasonable due to his lack of independence.

The Van Scotens argue that they were not negligent because they actively monitored their investment. They maintain that Mr. Van Scoten closely reviewed the various business reports, independent newspaper articles, news letters, and other correspondence they received from the Hoyt organization. Mr. Van Scoten also had regular phone conversations with Edward regarding what transpired at the partnership meetings Edward attended. In addition, the Van Scotens consistently paid the promissory notes throughout the period of their investment. Relying on Heasley, 902 F.2d at 383, they contend that ordinary care does not require more.

The Van Scotens read Heasley too broadly. To be sure, in rejecting the tax court's "far too-stringent standard for determining negligence," the Heasley court found that the taxpayers exercised due care in part because they took reasonable measures to monitor their investment. See id. at 383-84. However, the Heasley court addressed the taxpayers monitoring efforts only after it determined that they reasonably relied upon the advice of their financial advisor concerning the merits of the investment and their independent CPA regarding its proper reporting on their tax return. See id. Such steps were not taken here. And the Van Scotens investment monitoring efforts, which mostly consisted of reviewing information provided by the Hoyt organization, did not cure this failure.

VI. *Negligence Standard*

The Van Scotens argue that the Tax Court held them to an improper negligence standard because it neglected to consider the "similar circumstances" portion of the test. The Tax Court did not hold the Van Scotens to an improper standard of due care. The Van Scotens lacked the necessary knowledge to assess the economic legitimacy of the Hoyt partnerships and the tax benefits they claimed. Under these circumstances, it was incumbent upon them, as reasonably prudent persons, to gain such knowledge either through their own investigation or by seeking advice from a competent independent advisor. The Van Scotens' did neither. Instead, they relied on information they received from Mr. Hoyt, the Hoyt organization, and Edward. As discussed, such reliance was not reasonable. Accordingly, The Tax Court properly concluded that their actions fell below the standard of due care under the circumstances.[9]

The Van Scotens also refer us to this courts decision in <u>Anderson</u>, in

[9] The Van Scotens also contend that despite the significant weight given to the promoted tax benefits by the Tax Court, they did not invest primarily for the tax benefits provided by the partnership. This argument is utterly meritless. The record reveals that the Hoyt partnerships were operated in large part to generate tax savings and refunds for their partners. <u>See</u> R. Ex. 407-P at 14. The partners were required to remit seventy-five percent of these refunds they received to the Hoyt organization to fund its operations. <u>Id.</u> at 15. The partners retained the remaining twenty-five percent for themselves. <u>Id.</u> The Van Scotens were keenly aware of how this worked, each year remitting to the Hoyt organization the appropriate portion of the tax refunds they received. To simply state that the Van Scotens did not invest primarily for the tax benefits provided by the partnership, because perhaps they invested for capital appreciation, ignores the method by which a large portion of that capital was created: the tax savings of the partners.

support of their argument that the Tax Court applied the wrong negligence standard. In <u>Anderson</u>, the taxpayers invested in a program to purchase marine cargo containers that they never saw or verified personally, and for which they agreed to finance the bulk of the purchase price. 62 F.3d at 1267-69. As noted, the taxpayers in <u>Anderson</u> relied on their investment advisor to assess the economic substance of the proposed investment, which he found to be legitimate. <u>Id.</u> at 1268-69. The taxpayers' accountant, on the other hand, expressed concern as to the purported tax treatment of the investment. <u>Id.</u> at 1269. The taxpayers proceeded to invest in the business despite such concerns because they were convinced of the economic substance of the investment. <u>Id.</u> at 1271-72. Like the Hoyt partnerships, the container business turned out to be a sham. <u>Id.</u> at 1268. We ultimately found the taxpayers to be negligent because they failed to verify that the containers actually existed, actions a mythical reasonably prudent person would have taken under the circumstance. <u>See id.</u> at 1272-73. However, we found that the taxpayers were not negligent in disregarding their accountant's advice because "[his] concerns would not necessarily have caused a reasonable investor to investigate the business aspects of the program more thoroughly." <u>Id.</u> at 1272.

The Van Scotens contend that they did far more than the taxpayers in <u>Anderson</u> because they actually verified that the cattle existed before they

invested. This argument is not persuasive because our review of the record reveals that their independent confirmation efforts went no further than considering the comments made by Edward that he had seen cattle while working on a Hoyt ranch.[10] See I Tr. at 30. The fact that Edward observed some cattle surely would not satisfy a reasonably prudent person that the entire herd of cattle, which DSBS 87-C purported to own, actually existed.

They also argue that, like the taxpayers in Anderson, had they done more to investigate the tax aspects of the Hoyt partnerships they still would not have discovered that the operation was a sham and that they should not, therefore, be subject to the negligence penalty. The Commissioner responds that the Van Scotens' contention in this regard is built on a misunderstanding of the negligence penalty. The Commissioner maintains that "[t]he negligence test asks simply whether a taxpayer exercised the due care in filing his tax return that would be expected of a reasonable and prudent person under the circumstances." Aplee. Br. at 45. It also contends that Anderson does not support the proposition that a taxpayer can blindly rely on a tax shelter promoter and then avoid the negligence penalty by arguing that, in hindsight, any investigation would have been futile,

---

[10] The Van Scotens contention in their brief, Reply Br. at 19, that they also relied on the cattle count of an independent expert is irrelevant due to the timing of the count. Our review of the record reveals that this review occurred in 1993, well after the Van Scotens made their investment and the tax year at issue. See R. Ex. 417-P at 2205-54.

emphasizing that such an approach "would improperly place more emphasis on the skill of the charlatan than on the diligence of the taxpayer." Id. at 46 n.18.

We need look no further than the plain language of I.R.C. § 6662(a) to conclude that the Commissioner's argument focuses too narrowly on the due care element of the negligence test. "It our duty to give effect, if possible, to every clause and word of a statute." Duncan v. Walker, 533 U.S. 167, 174 (2001) (internal quotation omitted). "When confronted with clear and unambiguous statutory language, our duty is simply to enforce the statute that Congress has drafted." United States v. Ortiz, 427 F.3d 1278, 1282 (10th Cir. 2005). Section 6662(a) imposes an addition to tax of 20 percent on the portion of an underpayment "which is *attributable to . . . negligence* or disregard of rules or regulations." I.R.C. § 6662(a), (b)(1) (emphasis added). Under the statute's plain and unambiguous language, in order for the accuracy-related penalty to apply, the understatement must be attributable to the negligence of the taxpayer. This is akin to a causation requirement. That is, a taxpayer may be negligent in his efforts to comply with the Tax Code, but if the understatement at issue is not attributable to such negligence, then the penalty does not apply.

The Commissioner responds by arguing that even if an independent advisor might not have been able to uncover Mr. Hoyt's precise scheme, the advisor could have given the Van Scotens valuable insight regarding the Hoyt partnerships.

Aplee. Br. at 46. For example, an attorney or accountant knowledgeable in the fields of agriculture and partnership taxation could have confirmed or disputed Mr. Hoyt's claim that cattle ranching enjoyed a tax-favored status. Id. Such an advisor could have challenged the claim that the Hoyt organization could somehow, during the return-filing season, rearrange partnership losses to meet the individual tax needs of the partners. Id. at 46-47. And, an advisor would have spotted the timing problem for 1990, would have spotted the material participation problem in 1991, and would have told them that their partnership deductions were likely overstated given the amount of their contributions. Id. at 47.

Our determination of the issue presented here is guided by reference to the burden the Van Scotens must overcome. As stated, the Commissioner's determination of negligence is presumptively correct, and the taxpayer has the burden of proving it wrong. Anderson, 62 F.3d at 1271. This presumption of correctness extends to each element of the negligence determination, including whether an underpayment was attributable to the taxpayer's negligence.

We need not decide precisely where further investigation into the tax claims of the Hoyt partnerships would have led, given the Van Scotens' lack of evidence substantiating their contention that further investigation would not have revealed that the operation was a sham. No such investigation was conducted,

and no professional testified that the fraud probably could not have been discovered given an appropriate investigation. This would be a different case had (1) the Van Scotens consulted an independent tax professional and provided her with all the relevant information and she then advised them that, in her opinion, the deductions were legitimate, or (2) testimony from an independent professional supported the contention that the fraud could not have been discovered given an appropriate investigation based upon the facts and circumstances known at the time of the deductions. Argument of counsel will not suffice.

Moreover, to the extent that the evidence tends to show that Mr. Hoyt had a complete stranglehold on the Hoyt partnerships, and that the investors were unaware of the partnerships' dealings and "weren't given enough written information to allow an objective third party opinion by competent counsel," such evidence weighs against the Van Scotens on this issue. R. Ex. 502-P at 27. The Van Scotens exposed themselves to enormous potential liability when investing in the partnership by signing power of attorney forms that granted Mr. Hoyt the authority to incur *recourse* debt on their behalf and the power to control numerous aspects of their investment without prior consultation with them. A reasonably prudent person confronted with the prospect of making an investment bearing such risks, but to whom enough information was not given to allow an objective third party opinion by competent counsel as to the merits of the investment or the

- 33 -

tax implications thereof, would surely do more than what was done here before investing and claiming the resulting tax deductions.

Thus, the Tax Court's conclusion that the understatement at issue was attributable to the Van Scotens negligence in claiming the DSBS 87-C loss on their 1991 return is not clearly erroneous.

## VII. *Typical Abusive Tax Shelters*

The Van Scotens contend that the Hoyt partnerships were not typical abusive tax shelters. They maintain that the Tax Court incorrectly concluded as such in determining that their tax claims were obviously unreasonable. In support of their contention, the Van Scotens list several ways in which the Hoyt partnerships differ from the typical abusive tax shelter. This argument is curious. We need not detail each of the alleged differences, however, because our reading of the T.C. Memo indicates that the Tax Court made no such determination. But to the extent the Tax Court determined that the Hoyt partnerships were a sham, the record and the positions taken by the Van Scotens regarding the fraud of Mr. Hoyt certainly supports that conclusion.

## VIII. *Honest Misunderstanding of Fact*

Last, the Van Scotens argue that Mr. Hoyt's fraud, coupled with other factors, caused them to have an honest misunderstanding of fact. Section 6664(c)

of the Tax Code provides an exception to § 6662(a)'s addition to tax for any portion of an underpayment if the taxpayer can show that there was a reasonable cause for, and the taxpayer acted in good faith with respect to, that portion. Treas. Reg. § 1.6664-4(a). The determination of whether a taxpayer is entitled to the exception "is made on a case-by-case basis, taking into account all pertinent facts and circumstances." Id. § 1.6664-4(b)(1). Reasonable cause and good faith might be indicated by "an honest misunderstanding of fact or law that is reasonable in light of the experience, knowledge, and education of the taxpayer," but "reasonable cause and good faith is not necessarily indicated by reliance on facts that, unknown to the taxpayer, are incorrect." Id.

The Tax Court rejected the Van Scotens' honest mistake of fact argument, finding that "whether or not [they] had a 'mistake of fact' does not alter our conclusion that [their] actions in relation to their investment and the tax claims were objectively unreasonable." T.C. Memo at 32-33. "[W]e will review the tax court's factual determinations of whether a taxpayer qualifies for the reasonable cause exception for clear error." Estate of True v. Comm'r, 390 F.3d 1210, 1244 (10th Cir. 2004).

The Tax Court did not clearly err in its determination that the Van Scotens could not rely on the reasonable cause exception. Although the determination of whether a taxpayer is entitled to the exception is made on a case-by-case basis

taking into account "all the pertinent facts and circumstances," the most important is "the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." Treas. Reg. § 1.6664-4(b)(1). As discussed, the record reflects that the Van Scotens made little, if any, effort to assess the their proper tax liability given the mounting evidence indicating that their tax treatment of DSBS 87-C may be incorrect. Instead, they relied solely on the advice that they received from Mr. Hoyt and his organization, the very people who were receiving the bulk of the tax savings generated by their claimed refunds. According due weight to the Van Scotens efforts to assess their proper tax liability, we cannot conclude that the Tax Court clearly erred in finding that the Van Scotens did not qualify for the reasonable cause exception.

**AFFIRMED.**