# United States Court of Appeals for the Federal Circuit

2008-5045

JADE TRADING, LLC, by and through,
ROBERT W. ERVIN and LAURA KAVANAUGH ERVIN
on behalf of ERVIN CAPITAL, LLC, Partners Other
Than the Tax Matters Partner,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.


David D. Aughtry, Chamberlain, Hrdlicka, White, Williams & Martin, of Atlanta, Georgia, argued for plaintiffs-appellants. With him on the brief were Nicolas F. Kory; and Linda S. Paine, of Houston, Texas.

Joan I. Oppenheimer, Attorney, Appellate Section, Tax Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Gilbert S. Rothenberg, Acting Deputy Assistant Attorney General, and Richard Farber, Attorney.

Appealed from: United States Court of Federal Claims

Judge Mary Ellen Coster Williams

# United States Court of Appeals for the Federal Circuit

2008-5045

JADE TRADING, LLC, by and through,
ROBERT W. ERVIN and LAURA KAVANAUGH ERVIN
on behalf of ERVIN CAPITAL, LLC, Partners Other
Than the Tax Matters Partner,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims in 03-CV-2164, Judge Mary Ellen Coster Williams.

_____

DECIDED:  March 23, 2010
_____

Before LOURIE, ARCHER, and LINN, Circuit Judges.

ARCHER, Circuit Judge.

Jade Trading, LLC ("Jade") appeals the Court of Federal Claims' denial of its petition for readjustment of the partnership items of Jade and its affirmance of the Internal Revenue Service's ("IRS" or "Service") application of penalties at the partnership level without consideration of the partners' reasonable cause defense.  Jade Trading v. United States, 80 Fed. Cl. 11 (2007).  Because the contribution of euro call options to Jade (hereinafter sometimes called the spread transaction) was a transaction that lacked economic substance, we affirm the Court of Federal Claims' denial of Jade's petition.  Further, we hold that the Court of Federal Claims lacked jurisdiction to review

the application of penalties based on the outside bases of Jade's partners, and we therefore vacate that portion of the court's judgment and remand for further proceedings. We also vacate as moot the Court of Federal Claims' determination that Temp. Treas. Reg. § 301.6221-1T(c), (d) is not invalid.

I

A

This case is governed by certain provisions of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"). See 26 §§ U.S.C. 6221-31 (1998).[1] Prior to TEFRA's enactment, tax liability adjustments of individual partners based on the operations of the partnership were rendered at the partner level. "TEFRA was intended, in relevant part, to prevent inconsistent and inequitable income tax treatment between various partners of the same partnership resulting from conflicting determinations of partnership level items in individual partner proceedings." RJT Invs. X v. Comm'r Internal Revenue, 491 F.3d 732, 737 (8th Cir. 2007). Under TEFRA, all "partnership items" are determined in a single proceeding. 26 U.S.C. § 6221.[2] The results of this proceeding then apply to each individual partner's income tax return. If a partner wishes to challenge any adjustment to his income tax return or to assert any partner-level defenses, he may file a partner level refund suit. 26 U.S.C. § 6230(c).

---

[1]     Hereinafter, Title 26 U.S.C. is referred to as "the Tax Code."
[2]     Section 6221 of the Tax Code states "[e]xcept as otherwise provided in this subchapter, the tax treatment of any partnership item (and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item) shall be determined at the partnership level."

B

This case involves a tax shelter designed to produce large, artificial, i.e., noneconomic, losses for tax purposes.  Jade Trading, 80 Fed. Cl. at 20.  In general, the tax shelter here involved four steps:  "1) Investment in Foreign Currency, 2) Contribution to a Partnership, 3) Partnership Investments, 4) Termination of Partnership Interests."  Id. at 24-25 (describing tax opinion prepared for potential investors by BDO Seidman, a national accounting and tax consulting firm).  The investor first simultaneously purchased a European-style call option and sold a European-style call option.[3]  Id. at 25.  The investor next contributed the purchased and sold call options to a partnership.  Id.  The investor eventually exited the partnership, received an asset with a claimed high-basis and low-value, and then sold that asset in order to generate a tax loss.  Id.  A tax loss was anticipated because, at the time of the facts giving rise to this case, an investor's basis in a partnership was ordinarily not decreased by the amount of a contingent liability contributed to or assessed by a partnership.  See Helmer v. Comm'r, 34 T.C.M. (CCH) 727 (1975) (holding that a contingent obligation, such as an option, was not a liability under § 752 of the Tax Code because a partnership's obligation under the option does not become fixed until the option is exercised).[4]

C

The parties do not disagree with the basic facts found by the Court of Federal Claims.  Therefore, we recite only those facts relevant to this decision.

---

[3]  An option is a contract that gives the buyer the right, but not the obligation, to buy or sell an asset at a predetermined price (the strike price).  A European-style option is an option that can only be exercised on its expiration date.

[4]  The sold call option contributed to the partnership in this case is similarly a contingent obligation that does not become fixed until it is exercised.

Robert W. Ervin and his two brothers were equal partners in a cable business, which they sold in 1999. The sale proceeds received in March 1999 resulted in a total gain to each brother of approximately $13,500,000. Because the buyer was a publicly traded company, the transaction was disclosed to the Securities Exchange Commission. Thereafter, the Ervins received numerous offers of investment and tax advice. After considering a number of these investment and tax proposals, the following transaction at issue here was entered into by the Ervin brothers.

In September 1999, the Ervin brothers each formed a single-member LLC. On September 15, 1999, each Ervin LLC entered into a separate master trading agreement with AIG, and each paid AIG an $84,100 "account opening fee" pursuant to this agreement. On September 29, 1999, each Ervin LLC purchased from AIG a call option on the euro at a strike price of 1.0840 ("purchased call option") for $15,000,020 and sold to AIG a call option on the euro at a strike price of 1.0850 ("sold call option") for $14,850,018. The options were all European-style options that expired on September 29, 2000, and had a face amount of 290,540,000 euros. Each Ervin LLC paid AIG only the difference in the premiums of the offsetting options, or $150,002.

On October 2, 1999, each Ervin LLC entered into a fifteen-month "consulting agreement" with New Vista, LLC (an affiliate of Sentinel Advisors, LLC), which required each Ervin LLC to pay New Vista $750,000 for "consulting services." Payment of this fee was a prerequisite to the Ervin LLCs being admitted to the Jade partnership. Jade was formed by Sentinel and Banque Safra, a Luxembourg financial institution, on September 23, 1999, with Sentinel as the managing partner. On October 6, 1999, each Ervin LLC entered Jade as a partner. On that same day, each Ervin LLC contributed

the above described euro call options to Jade, as well as $75,000 cash. In December 1999, each Ervin LLC withdrew from Jade. Each Ervin LLC's interest in assets distributed to it by Jade was valued at $126,122. The distributed assets consisted of Xerox stock, which was sold in 1999, and euros.

On its partnership return for 1999, Jade reported on its Schedule K (Partners' Shares of Income, Credits, Deductions, etc.) a loss of $292,015. Each of the Ervin brother's individual income tax return for 1999 claimed approximately $15 million in tax losses from his execution of the spread transaction and involvement in Jade. These tax losses resulted from each brother's increasing the basis of his interest in Jade ("outside basis") by the cost of the purchased call option ($15 million) and not decreasing this basis by the amount of the potential liability that Jade assumed under the sold call option.

After auditing the Jade partnership return, the IRS issued a final partnership administrative adjustment ("FPAA") to Jade with respect to Jade's partnership items for the 1999 tax year. The FPAA determined that the Jade partnership should be disregarded and all transactions engaged in by Jade should be treated as being engaged in directly by the purported partners, including the Ervin LLCs. Thus, the FPAA disallowed the deductions claimed for losses purportedly incurred from the contribution of the spread transactions to Jade. The FPAA also disallowed the losses claimed by Jade and reduced Jade's claimed distributions of property to zero. The IRS also imposed accuracy-related penalties under § 6662 of the Tax Code.

Subsequently, Jade filed a petition for readjustment of the partnership items of Jade in the Court of Federal Claims. The court upheld the IRS's determination,

concluding that Jade had not met its burden of demonstrating that the contribution of the spread transactions to Jade objectively had economic substance. Jade Trading, 80 Fed. Cl. at 14. The court also affirmed the penalties determined by the IRS at the partnership level without considering the reasonable cause defenses that the partners might have. Id. at 60.

Jade appealed, and we have jurisdiction under 28 U.S.C. § 1295(a)(3).

II

A

We review de novo the Court of Federal Claims' conclusion that the contribution of the spread transaction to Jade lacked economic substance. Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1357 (Fed. Cir. 2006). However, we review the court's factual findings underlying this conclusion for clear error. SCS Hosp. Sys., Inc. v. Montefiore Hosp., 732 F.2d 1572, 1578 (Fed. Cir. 1984). Finally, we review the court's jurisdictional determinations de novo. Distributed Solutions, Inc. v. United States, 539 F.3d 1340, 1343 (Fed. Cir. 2008).

B

The Court of Federal Claims held that the Ervin LLCs' contributions of the spread transactions to Jade lacked economic substance. We agree.

The economic substance doctrine "require[s] disregarding, for tax purposes, transactions that comply with the literal terms of the tax code but lack economic reality." Coltec, 454 F.3d at 1352. In Coltec we discussed the economic substance doctrine in detail, leaving no question as to its viability. We explained that the doctrine "represents a judicial effort to enforce the statutory purpose of the tax code." Id. at 1353. The

doctrine, "[f]rom its inception, . . . has been used to prevent taxpayers from subverting the legislative purpose of the tax code by engaging in transactions that are fictitious or lack economic reality simply to reap a tax benefit." Id. at 1353-54. In Coltec, after examining cases from the Supreme Court, various courts of appeals, and our predecessor court, we concluded that the economic substance doctrine incorporated five general principles. Specifically, we opined that 1) the transaction cannot lack economic reality; 2) the taxpayer bears the burden of proving that the transaction has economic substance; 3) the economic substance of a transaction must be viewed objectively rather than subjectively; 4) the transaction to be analyzed is the one that gave rise to the alleged tax benefit; and 5) arrangements with subsidiaries that do not affect the economic interests of independent third parties deserve particularly close scrutiny. Id. at 1355-57. We also explained that "a lack of economic substance is sufficient to disqualify the transaction without proof that the taxpayer's sole motive is tax avoidance." Id. at 1355.

The Ervin LLCs' transfer of the spread transactions to Jade lacked economic substance. The Ervin LLCs purchased euro call options from AIG for a premium of $15,000,020 and sold euro options to AIG for a premium of $14,850,018. However, the Ervin LLCs paid AIG only the difference – a net premium of $150,002. After contributing the spread transactions to Jade and subsequently exiting the partnership, the Ervins claimed a basis of over $15 million in their Jade interests by including only the cost of the purchased call option. As a result, the artificially inflated basis generated a purported $14.9 million tax loss.

As the Court of Federal Claims noted, this loss was "purely fictional." Jade Trading, 80 Fed. Cl. at 45. Each Ervin LLC did not invest $15 million in the spread transaction contributed to Jade and did not lose almost $15 million upon exiting Jade. Neither option was, in fact, exercised. Thus, each Ervin LLC had a real loss of approximately $100,000 upon exiting Jade – the difference between its capital contribution of $225,000 to the Jade partnership and its redemption proceeds of $126,122 received from Jade.

Additionally, the formation of the Jade partnership appears to have had no economic purpose. The partnership did nothing to enhance the investment potential of the spread transaction. Id. at 46. However, for tax purposes, it was imperative that the individual partners contribute the spread transactions to Jade to generate the artificially inflated bases.

Also significant is the Court of Federal Claims' determination that the spread transaction was virtually guaranteed to be unprofitable. Each Ervin LLC was required to pay an $84,100 account opening fee to AIG and a $750,000 New Vista consulting fee.[5] Thus, each Ervin LLC spent at least $834,100 for the chance at making a profit of

---

[5] In its findings, the Court of Federal Claims also included fees for an opinion letter prepared by Curtis Mallet. It is unclear whether each Ervin LLC was "required" to purchase the $100,000 tax opinion letter. However, given that the letter was requested to cover "certain aspects of United States Federal income tax in connection with (i) investments in foreign currency that [the Ervins had] made and (ii) transactions in which [they] engaged with a partnership . . . that trades in foreign currency," Jade Trading, 80 Fed. Cl. at 33, it is likely that the Ervins felt compelled to purchase the letter. The inclusion or absence of this fee does not change our analysis.

Additionally, the fees listed above do not include Sentinel's 2% management fee or its 20% incentive fee, or the 5% penalty for early withdrawal from Jade (which applied if the Ervin LLCs withdrew from Jade prior to 12 months from entering the partnership, which they did).

$140,000.[6] No reasonable investor would engage in such a transaction to earn a profit.

The Court of Federal Claims concluded, and we agree, that

> This transaction's fictional loss, inability to realize a profit, lack of investment character, meaningless inclusion in a partnership, and disproportionate tax advantage as compared to the amount invested and potential return, compel a conclusion that the spread transaction objectively lacked economic substance.

Id. at 14. As the Court of Federal Claims found, this spread transaction and its contribution to Jade "was developed as a tax avoidance mechanism and not as an investment strategy" by the BDO Seidman accounting firm. Id.

Jade argues that the contribution of the spread transactions to Jade had economic substance because the purchased call options and the sold call options were separate assets with separate documentation and were owned by unrelated parties. The Court of Federal Claims concluded that "the economic realities of the spread transaction contributed to Jade made it impossible to delink the option pairs," explaining:

> If the Ervin LLCs had wished to hold only the long position – that is, the option they purchased from AIG – they would have faced the prospect of theoretically unlimited gain. . . . To obtain that position, the Ervin LLCs would have been required to pay AIG the full face amount of the premium, about $15 million each, to purchase the options. Neither the Ervin LLCs nor Jade ever had sufficient funds to make such a payment. Moreover, under this scenario, the entire amount would have been at risk; had the euro not risen to 1.084, each Ervin LLC would have lost the entire $15 million premium it paid to AIG.

> Had the Ervin LLCs wished to hold on the short option sold to AIG, they would have faced the prospect of theoretically unlimited loss, as AIG would have benefitted in any rise of the euro above 1.085, not capped in any way. Because such a transaction would be uncovered, AIG would

---

[6] This is calculated by subtracting the cost of each spread transaction ($150,002) from its maximum payoff ($290,540) that could occur due to the different option prices.

have had extensive credit concerns. The Ervin LLCs would not have received the premiums to which they would be theoretically entitled, because AIG would have retained those premium payments as margin, because AIG would not have had the spread's protection from loss. AIG would have required that the Ervins post margin in the amount of at least $8 million each. In sum, under the agreement with AIG, the Ervins could not separate the components of the spread without AIG's permission which would not likely have been forthcoming without the required margin.

Id. at 50-51 (citations to record omitted). As the government's expert explained, "[t]he spread strategy component options were priced together, purchased together, contributed to Jade together, and closed out by Jade together, and at no time during their lives did either the Ervin LLCs or Jade have the means to separate the component options." **[JA 5817]** The Court of Federal Claims concluded that "the transactions here cannot be separated because they were totally dependent on one another from an economic and pragmatic standpoint." Id. at 51. Jade has not persuaded us that this conclusion is in error.

Accordingly, we affirm the Court of Federal Claims' judgment that the contribution of the spread transactions to Jade lacked economic substance and should be disregarded for tax purposes.

C

Jade asserts that the Court of Federal Claims does not have jurisdiction to review the penalties imposed by the IRS based on the Ervins' outside bases in Jade.

Section 6226 of the Tax Code is TEFRA's judicial review provision. Specifically, § 6226(f) grants the trial court (either the Court of Federal Claims or the United States Tax Court):

jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates, the proper allocation of such items

among the partners, and <u>the applicability of any penalty</u>, addition to tax, or additional amount which <u>relates to an adjustment to a partnership item</u>.

26 U.S.C. § 6226(f) (emphases added).[7]

Jade contends that because the Ervins' outside bases in Jade, upon which the assessed penalties are based, are not partnership items, there could be no penalty applicable to a partnership item to trigger the court's penalty jurisdiction under § 6226(f).

The government responds that while a partner's outside basis is an affected item and thus not itself a partnership item, most (if not all) of the components of a partner's outside basis are themselves partnership items. The government further argues that since all "legal and factual determinations that underlie the determination of the amount, timing, and characterization" of partnership items are themselves partnership items, the lack of economic substance of the spread transactions contributed to Jade is a partnership item.

In a factually analogous case, the D.C. Circuit considered whether § 6226(f) conferred jurisdiction on the trial court, in that case the Tax Court, to determine that the partners had no outside bases in a partnership that was disregarded for tax purposes. <u>Petaluma FX Partners , LLC. v. Comm'r of Internal Revenue Serv.</u>, 591 F.3d 649 (D.C. Cir. 2010). In <u>Petaluma</u>, the purported partnership, Petaluma, was formed with the purpose of engaging in foreign currency option trading. <u>Id.</u> at 650. The partners each contributed pairs of offsetting long and short foreign currency options to become

---

[7] Under TEFRA, a "partnership item" is "any item required to be taken into account for the partnership's taxable year under any provision of subtitle A . . . provided that . . . such item is more appropriately determined at the partnership level than at the partner level." 26 U.S.C. § 6231(a)(3). TEFRA further defines two other terms, namely, a "nonpartnership item" and an "affected item." A "nonpartnership item" is one that is not a "partnership item." 26 U.S.C. § 6231(a)(4). And an "affected item" is one that is affected by a "partnership item." 26 U.S.C. § 6231(a)5.

partners in Petaluma.  Id.  The partners increased their adjusted bases in Petaluma to reflect the long options they contributed, but they did not reduce those bases to reflect Petaluma's assumption of their short options.  Id.  The partners subsequently withdrew from Petaluma, which fully liquidated their interest in the partnership by distributing cash and shares of Scient stock.  Id.  Prior to the end of the year, the partners sold their stock, taking their adjusted bases in the distributed stock equivalent to their adjusted bases in Petaluma immediately prior to the distribution.  Id.  Given the inflated adjusted bases in the stock, these sales created substantial short-term capital losses that the partners claimed on their federal tax returns.  Id.

The parties' arguments on appeal in Petaluma were strikingly similar to those in this case.  As in the present case, Petaluma argued that outside basis is an affected item, not a partnership item and, therefore, the Tax Court had no right to determine that its partners' outside bases were zero.  Id. at 654.  Also similar to this case, the government conceded that outside basis is not a partnership item but then argued that outside basis is an affected item whose elements are largely or entirely partnership items.  Id.

The D.C. Circuit agreed with Petaluma, stating that "the partners' outside bases are affected items, not partnership items.  Unlike partnership items, affected items are determined not at the partnership level, but at the individual partner level."  Id.  The court observed that not only are partnership items and affected items treated at different levels, the assessment procedures are different.  Id. at 655.  In the case of a partnership item, the IRS may directly assess the tax against the individual partner by making a computational adjustment—applying the new tax treatment of all partnership items to

the partner's return—and the partner must bring a refund claim to challenge the computation. 26 U.S.C. § 6230(c)(1). However, if the partner's liability relates to affected items, the IRS must send a notice of deficiency to that partner, thereby initiating a deficiency proceeding against him individually. 26 U.S.C. § 6230(a)(2)(A)(i); see Desmet v. Comm'r of Internal Rev., 581 F.3d 297, 302 (6th Cir. 2009) (explaining that the IRS has different procedures for making adjustments to a partner's tax liability depending on whether the item is a partnership item or an affected item).

The court concluded that under § 6226(f) the Tax Court did not have jurisdiction to review the determination that the individual partners had no outside basis in Petaluma. The court rejected the government's contention that, although an affected item, outside basis could be determined in the partnership-level proceeding. "The fact that a determination seems obvious or easy does not expand the court's jurisdiction beyond what the statute provides. In other words, it does not matter how low the fruit hangs when one is forbidden to pick it." Id. at 655.

We find the D.C. Circuit's reasoning persuasive and see no reason to depart from it in this case. While the parties here are different, each of the Ervins' outside basis in Jade is an affected item and thus not determined at the partnership level. See Schell v. United States, 598 F.3d 1378, 1381-82 (Fed. Cir. 2009) ("An example of an 'affected item' is a partner's tax basis in his partnership interest, which is affected by partnership items such as partnership income or loss."). We also agree with the D.C. Circuit's observation:

> [N]othing about the concept of outside basis indicates that it is more appropriately determined at the partnership level. If disregarding a partnership leads ineluctably to the conclusion that its partners have no outside basis, that should be just as obvious in partner-level proceedings

as it is in partnership-level proceedings. Moreover, with the invalidity of the partnership conclusively established as a partnership-level determination, there is little danger that outside basis will receive inconsistent treatment at the individual partner level.

Petaluma, 591 F.3d at 655.

Because outside basis is not a "partnership item," we conclude that the Court of Federal Claims lacked jurisdiction to determine that the Ervins had no outside basis in Jade.

As explained above, under § 6226(f), the trial court has jurisdiction over "the applicability of any penalty . . . which relates to an adjustment to a partnership item." The penalty in this case was imposed on the underpayment of income tax due to the gross valuation misstatement of the partners' outside basis in the partnership. Outside basis is an affected item, not a partnership item; thus, the penalty here relates to an adjustment of an affected item, not a partnership item. Accordingly, the trial court did not have jurisdiction over the applicability of this particular penalty.

Because it is possible that at least some portion of the penalties could have been computed without relying on the partners' outside bases, we conclude that the penalty issue should be vacated and remanded. See id. at 655-56 (remanding for a determination as to whether some of the penalties could have been assessed without partner-level computations). Remand proceedings should determine whether any penalties could have been assessed without relying on the Ervins' outside bases.

D

Finally, Jade argues that the Court of Federal Claims should have considered the Ervin's reasonable cause defenses, asserting that Temp. Treas. Reg. § 301.6221-1T(c), (d) is invalid. Because we vacate that portion of the Court of Federal Claims' judgment

affirming the penalties assessed against the Ervins, the validity challenge to the temporary regulation is moot at this time, and we decline to reach it.  See United States v. Alaska S.S. Co., 253 U.S. 113, 116 (1920) ("[I]t is a settled principle in this court that it will determine only actual matters in controversy essential to the decision of the particular case before it."); see also United States v. UPS Customhouse Brokerage, Inc. 575 F.3d 1376, 1383 (Fed. Cir. 2009) (vacating as moot the issue of whether Customs could impose penalties aggregating more than $30,000 under 19 C.F.R. § 111.91 when the case was being remanded for Customs to conduct a proper analysis of whether there was in fact a violation of 19 U.S.C. § 1641); Elkem Metals Co. v. United States, 468 F.3d 795, 803 (Fed. Cir. 2006) (concluding that because an amount was properly excluded from constructed value, the issue of whether the party correctly reported that amount was moot and need not be decided).  While the Court of Federal Claims could conclude on remand that some of the penalties could have been assessed without relying on the Ervins' outside basis and thus putting this issue back into play, the opposite is also true.  Although these issues are important to the parties and may become relevant later in this case, deciding them now would be premature.

Accordingly, we vacate that portion of the Court of Federal Claims' judgment concluding that the Ervins' partner-level defenses cannot be brought at the partnership level.

III

Because the Court of Federal Claims correctly concluded that the contribution of the spread transactions to Jade lacked economic substance, we affirm the court's denial of Jade's petition for readjustment of partnership items.  However, because the Court of

Federal Claims lacked jurisdiction to review the penalties imposed on the underpayment of income tax due to the gross valuation misstatement of the Ervins' outside bases in Jade, we vacate that portion of the court's judgment affirming the penalties assessed against the Ervins.  Additionally, we remand this issue for the court to determine whether any part of the penalties could have been assessed without relying on the Ervins' outside bases and thus falling within the court's jurisdiction.  Finally, we vacate as moot that portion of the Court of Federal Claims' judgment upholding the validity of Temp. Treas. Reg. § 301.6221-1T(c), (d).

## **AFFIRMED-IN-PART, REVERSED-IN-PART, VACATED-IN-PART.**

### COSTS

Each party shall bear its own costs.