106 LTD., DAVID PALMLUND, TAX MATTERS PARTNER, PETITIONER *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 14586–05.          Filed January 10, 2011.

Partnership P entered into a Son-of-BOSS transaction. This generated more than $1 million in artificial losses which P's partners claimed on their 2001 returns. R adjusted various partnership items and determined a penalty under sec. 6662(h), I.R.C., for a gross-valuation misstatement of P's inside basis in an asset distributed by P. P now contests only that penalty, alleging it has a reasonable-cause-and-good-faith defense. *Held*: The Court has jurisdiction over the penalty in this partnership-level proceeding after *Petaluma FX Partners v. Commissioner,* 135 T.C. 581 (2010), because the penalty relates to an adjustment to inside basis, a partnership item, that results in a computational adjustment to the partner's tax return that can be assessed without a partner-level affected items proceeding. *Held*, *further*, we agree with the Court of Appeals for the Seventh Circuit in *American Boat Co. LLC v. United States,* 583 F.3d 471 (7th Cir. 2009), that a partnership can assert its own reasonable-cause-and-good-faith defense in a partnership-level proceeding. *Held*, *further*, P cannot reasonably rely in good faith on the tax advice given by a "promoter", defined as an adviser who participates in structuring the transaction or who is otherwise related to, has an interest in, or profits from the transaction.

*William A. Roberts* and *Kyle R. Coleman*, for petitioner.
*Nancy B. Herbert*, *Richard Hassebrock*, and *Jadie T. Woods*, for respondent.

HOLMES, *Judge*: David Palmlund bought into a bad deal to lose money but save on taxes. He has since filed an amended return and paid the tax he was trying to avoid. But he contests the penalty that the Commissioner asserts against him; he argues that he relied in good faith on professional advisers.

FINDINGS OF FACT

## I. *Palmlund*

David Palmlund started his professional life in upstate New York. In 1964 he graduated with a dual degree in industrial engineering and management accounting from Syracuse University, then took a job in Rochester with Eastman Kodak as a cost engineer. After a year in the corporate world, duty called; he served in the Army as an ordnance officer stationed at the Aberdeen Proving Grounds, but also spent time in Vietnam with the State Department on matters he "can't talk about in Asia." Then he returned to Syracuse, completed his M.B.A. in 1968, and went back to Eastman Kodak.

But the draw of a larger city proved irresistible. Palmlund moved to New York to work for American Cyanamid Chemical Company from 1968 to 1972. He started out as an operations analyst—finding ways to improve the operations of subsidiaries—and moved up to become a budget analyst involved in major acquisitions. His entrepreneurial spirit caught the attention of like-minded young men, and together they formed a home-warranty company, American Home Shield, in 1972. As chief administrative officer, Palmlund set up American Home Shield's operations, developed the company's pricing model, and hired the contractors who would perform the covered home repairs. American Home Shield grew to be a successful, $800 million-a-year company.

Palmlund then moved to Merrill Lynch in 1975. He eventually became vice president and controller, as well as CEO of several Merrill subsidiaries. At one of these, Merrill Lynch Realty, Palmlund had 10,000 employees under his direction working in New York and London. He then returned to American Home Shield as chief operating officer. In 1980 he took four months off to care for his wife and moved to Dallas to be closer to her family.

Palmlund contacted some of the executive recruiters he met while working for Merrill—he got to know them well during the time he hired about one manager a week—to see what jobs there might be for him in Dallas. Instead, the recruiters recruited him to join their company. Palmlund wasn't interested at first because he didn't like the way recruiters operated, but the recruiters replied: "Fine, come in

and change it." He agreed to give it a try, with the understanding that he could do things his way for a while; if it didn't work out, he would leave.

His way was based on personal contact. He would meet each candidate face to face, never offering anyone for a position whom he hadn't met in person. This was labor intensive—Palmlund accumulated over 10 million frequent-flyer miles—but his approach paid off. He became a partner at his firm, his firm became the world's largest, and he placed more senior executives than anyone else at it. All of his placements stayed in their new jobs at least a year; every other partner had to redo some.

Palmlund's success made his tax reporting complicated, and for many years he relied on Arthur Andersen. In the early '90s, his firm hired a financial planner who recommended setting up limited partnerships, living trusts, and other entities to help Palmlund meet his financial goals—and who also recommended, as the lawyer to set it all up, one Joe Garza. Palmlund ended up using Garza off and on over the next 20 years not only for the financial-planning-entity-creation work, but for all his legal needs. Garza in turn recommended Turner & Stone to Palmlund as a more affordable alternative to Arthur Andersen for tax preparation. But even at those lower rates, Palmlund was an active and frugal client who carefully reviewed every return—and noticed when one year Turner & Stone nearly doubled its fee to $2,700. He credibly testified that he "moaned and groaned" until it was reduced.

## II. *The Transaction*

Sometime early in 2001, Garza called Palmlund to briefly pitch an "investment" in foreign currency. Palmlund dismissed the idea because he didn't have much experience in the field. [1] But he was no neophyte investor—he ran a real-estate investment partnership, actively picked stocks, and formed a Texas family limited partnership named Palmlund, Ltd., with the stated business of "investments." He also had numerous personal bank and brokerage accounts that he actively managed.

---

[1] His only experience was ordering his staff at Merrill Lynch's London office to hedge against a threatened devaluation of the pound. He did not personally implement the transaction.

Palmlund says that he warmed up to the transaction after receiving a "hot tip" at a cocktail party in mid-2001. But this tip came from his business partner's daughter, who mentioned that "the yen is weak and is going to get weaker." We do not think this is a credible explanation for Palmlund's interest in foreign-currency speculation, and instead find that his interest was really sparked when Garza resurfaced.

Garza, however, was not really urging a speculative foray into foreign currency—he was pitching a particular transaction that he explained had significant tax benefits. The deal was a variation of the Son-of-BOSS transaction that has produced so much litigation in recent years.[2] He tried to explain its basic structure, though on this topic Palmlund credibly testified that the explanation, with its use of foreign-currency digital options and the "super sweet spot"—allegedly a way to make a large profit if the dollar-to-yen exchange rates worked out just right—was not entirely comprehensible. But Garza's tutorials never really got Palmlund interested in the theory of how to make foreign-currency options trading profitable. What got him interested—and we specifically find this based on the trial testimony—was the alluring tax benefit. Palmlund ran Garza's suggestion by his accountants at Turner & Stone. The accountants gave him the green light, telling him they themselves had used the same transaction. And Garza personally guaranteed the deal, promising to cover any taxes, penalties, or litigation costs if the transaction blew up.

---

[2] We lay out only the barest of bones, because Palmlund has conceded the tax and fights only the penalty. Very similar deals have been dissected elsewhere. See, e.g., *Highwood Partners v. Commissioner*, 133 T.C. 1 (2009). For an explanation of Son-of-BOSS deals, see *Kligfeld Holdings v. Commissioner*, 128 T.C. 192 (2007); see also, e.g., *BLAK Invs. v. Commissioner*, 133 T.C. 431 (2009); *3K Inv. Partners v. Commissioner*, 133 T.C. 112 (2009); *Olesen v. Commissioner*, T.C. Memo. 2009–307; *Bergmann v. Commissioner*, T.C. Memo. 2009–289; *LVI Investors, LLC v. Commissioner*, T.C. Memo. 2009–254; *UTAM, Ltd. v. Commissioner*, T.C. Memo. 2009–253; *Tigers Eye Trading, LLC v. Commissioner*, T.C. Memo. 2009–121; *Napoliello v. Commissioner*, T.C. Memo. 2009–104; *Fears v. Commissioner*, T.C. Memo. 2009–62.

Son-of-BOSS deals come in different varieties. But they all involve the transfer of assets along with significant liabilities to a partnership, with the goal of increasing basis in that partnership. The liabilities are not completely fixed at the time of transfer, so the partnership ignores them in computing basis. This results in high-basis assets that produce large tax—but not out-of-pocket—losses. Son-of-BOSS transactions usually yield capital losses, but Palmlund offset ordinary income because he attached the high basis to Canadian dollars, and on his original return took the position that certain foreign-currency transactions may produce an ordinary loss. See sec. 988(a); sec. 1.988–3(a), Income Tax Regs. (Unless we say otherwise, all section references are to the Internal Revenue Code in effect for the year at issue.)

This was good enough for Palmlund. He directed Garza to handle all the paperwork and told his secretary to forward any correspondence about the deal directly to Garza. Here are the mechanics:

• In November 2001, Palmlund formed three entities: 32, LLC (32 LLC); 7612, LLC (7612 LLC); and 106, Ltd. (106). The owners of 106 were David Palmlund (99 percent) and 32 LLC (1 percent). Palmlund's Texas family limited partnership, Palmlund, Ltd., is also involved in this case. Its partners were David Palmlund (49.5 percent), Suzanne Palmlund (49.5 percent) and the David Channing Palmlund Trust (1 percent).

• Also in November 2001, 7612 LLC bought offsetting long and short foreign-currency options. The termination date for both options was December 12, 2001, when they would expire out-of-the-money.

• On November 26, 2001, 7612 LLC transferred both long and short options to 106.

• On December 5, 2001, 7612 LLC bought Can$6,207.82 for US$4,000.

• On December 24, 2001, 7612 LLC transferred the Canadian currency to 106 as a capital contribution.

• On December 26, 2001, 106 tried to assign all of its Canadian currency to Palmlund, Ltd., but actually distributed only Can$2,172.74. Can$4,035.08 remained with 106 until it sold the currency in October 2002.

Palmlund testified that he earned $10,000 in two weeks. Deutsche Bank paid out $40,000 on the options and charged a $30,000 net premium.[3] If these had been the only expenses involved, the deal would have been profitable. But Palmlund doesn't include Garza's fees in his profit calculation. Those fees shrink the $10,000 "profit" to a loss of somewhere between $32,000 and $85,000.[4]

---

[3] The premiums on the long and short option positions were $3 million and $2,970,000, respectively.

[4] The exact amount of Garza's fee is unclear from the record. It was either $72,000 or $95,000, and the $30,000 net premium may or may not have been included in the fee. Assuming the lowest possible Garza fee—$72,000 with the net premium included—Palmlund would have lost $32,000 on the deal ($40,000 option payout less $72,000 for Garza's fee). At the other end of the spectrum—$95,000 not including the net premium—Palmlund would have lost $85,000 ($40,000 option payout less the $30,000 net premium and the $95,000 Garza fee).

III. *Reporting the Transaction*

Palmlund used Turner & Stone to prepare his 2001 return. A critical part of that preparation was the opinion letter Garza wrote, which Palmlund forwarded to them. The opinion letter contains a 4-page introduction tailored to the deal, but the remaining 85 pages consist mostly of generic boilerplate on tax-law doctrines—running the gamut from partnership-basis rules, treatment of foreign-currency contracts, the step-transaction doctrine, economic substance, disguised-sale provisions, and partnership anti-abuse regulations. In the letter, Garza concluded that the tax treatment he proposed would "more likely than not" withstand IRS scrutiny.[5] To reach this conclusion, Garza had to clear a few hurdles. In the introductory pages, he states that Palmlund represented that he

• "independently reviewed the economics underlying the investment,"

• "believed there was reasonable opportunity to earn a reasonable pre-tax profit * * * in excess of all associated fees and costs," and

• received "[t]he foreign currency and financial instruments * * * as Partnership *liquidating* distributions." (Emphasis added.)

Here's the first stumble—we find that Palmlund did no such things. But even if he had, Garza still didn't get it right—he failed to customize the opinion letter to fit the facts of the transaction. Here are a few of the mistakes:

• The foreign currency was distributed to Palmlund in liquidation of his partnership interest.

• No it wasn't; it was a nonliquidating distribution in 2001.

• Unrelated partners confirmed the partnership's legitimacy.

• All the partners were related—and Palmlund controlled them.

---

[5] One factor to consider in determining whether the good-faith-reliance defense applies is the existence of an "opinion of a professional tax advisor * * * as to the treatment of the taxpayer * * * under Federal tax law." Sec. 1.6664–4(c)(1), Income Tax Regs. In analyzing corporate tax shelters, citing the "more likely than not" standard—defined as "a greater than 50-percent likelihood that the tax treatment of the item will be upheld if challenged by the Internal Revenue Service"—is a necessary, but not sufficient, condition in such opinions. Sec. 1.6664–4(e)(2)(i)(B), (3), Income Tax Regs. Since 106 isn't a corporation, the "more likely than not" conclusion might not strictly be necessary, but Garza still cited the standard in his opinion letter.

• Palmlund doesn't know if he will be called upon to satisfy his obligations under the sold digital option.

• The options had already been terminated by the time the opinion was drafted.

Relying on the opinion letter, Turner & Stone prepared returns for 106, 32 LLC, Palmlund, Ltd., and Palmlund in 2002. They charged $8,000 for return preparation; Palmlund didn't complain. He didn't review the returns or ask any questions, claiming that he "wouldn't even know what to ask" about the returns. The result was happy for a time—a noneconomic loss of about $1 million flowed through to his personal return.

Palmlund did get concerned when the IRS sent him a copy of Announcement 2004–46, 2004–1 C.B. 964, in May 2004. The announcement outlined terms of settlement for Son-of-BOSS transactions. Palmlund met with Garza and his accountants to figure out what he should do, and what he decided to do was amend his personal return. (No one ever amended 106's return.) Turner & Stone finished the amended return in August 2004, and Palmlund signed it in September. This return removed the $1 million loss attributed to the disallowed transaction, and Palmlund paid the taxes and interest he conceded were due.

The IRS issued an FPAA to 106 that adjusted various partnership items (including contributions and distributions) to zero and asserted penalties. Palmlund, as 106's tax matters partner, timely petitioned the Tax Court. In the course of preparing for trial, the Commissioner subpoenaed Charles Denson, Palmlund's private banker. Denson was curious about the subpoena and set up a lunch with Palmlund. He asked about the case, and Palmlund explained that he got into a tax strategy "and the intent was to lose money."

Before trial began, we issued two orders. In the first, we granted the Commissioner partial summary judgment on the issue of whether the 2001 asset distribution from 106 was nonliquidating. As a result, the adjusted basis for 106's distribution to Palmlund, Ltd., in 2001 is limited to the partnership's adjusted basis (i.e., inside basis)[6] in the Canadian currency. See sec. 732(a); *7050, Ltd. v. Commissioner*, T.C. Memo. 2008–112. In our second order, we granted the

---

[6] Inside basis is a partnership's basis in property that it owns.

Commissioner's motion for partial summary judgment on the issue of whether there was a gross-valuation misstatement in excess of 400 percent on the 106 return. This second order required little more than a bit of math, because 106's assets were Canadian dollars bought for US$4,000. The partnership distributed some of those Canadian dollars in 2001, so 106's basis—the inside basis—in those distributed dollars was $1,400. The return claimed a $2.974 million basis in the distribution, which is significantly more than 400 percent of $1,400, and was reduced by the FPAA to zero.[7]

Because Palmlund conceded the taxes related to the underlying transaction, the only remaining question is whether the partnership has a section 6664(c) reasonable cause/good faith defense—based upon reliance on Garza and Turner & Stone—to the 40 percent gross-valuation-misstatement penalty the Commissioner asserts under section 6662(h). This penalty relates to inside basis—106's overvaluation of its basis in the Canadian dollars it distributed to Palmlund Ltd.

OPINION

I. *Jurisdiction*

In January 2010, the D.C. Circuit[8] decided *Petaluma FX Partners v. Commissioner*, 591 F.3d 649 (D.C. Cir. 2010), affg. in part, revg. in part, vacating in part and remanding on penalty issues 131 T.C. 84 (2008).[9] It held that the Tax Court lacks jurisdiction in partnership-level proceedings to determine a partner's basis in the partnership or whether penalties related to that basis apply. *Id.* at 655–56.[10] After the D.C. Circuit issued its opinion, we asked the parties in this case to brief the question of whether we have jurisdiction, and both tell us that we do.

At first glance, *Petaluma* seems strikingly similar to *106*. Like the tax shelter in *Petaluma*, the transaction has the foreign-currency-option flavor of a Son-of-BOSS deal. Accuracy-

---

[7] The parties did not dispute this calculation and holding.

[8] 106 was a Tax Equity and Fiscal Responsibility Act of 1982 partnership without a principal place of business when it filed its petition, because it no longer existed. Any appeal therefore may go to the D.C. Circuit. See sec. 7482(b)(1).

[9] In March 2010, the Federal Circuit followed *Petaluma* in *Jade Trading, LLC v. United States*, 598 F.3d 1372, 1379–80 (Fed. Cir. 2010), making essentially the same holding on almost identical facts.

[10] We recently reanalyzed the problem in response to the D.C. Circuit's mandate in *Petaluma*. See *Petaluma FX Partners v. Commissioner*, 135 T.C. 581 (2010).

related penalties are at stake in both cases. But there's a key distinction—*Petaluma* held that the Tax Court had no jurisdiction over penalties springing from an adjustment to a partner's outside basis,[11] but the parties here agree that outside basis is not an issue. In the FPAA that provoked this case, the Commissioner determined that "the accuracy-related penalty under section 6662(a) of the Internal Revenue Code applies to all underpayments of tax attributable to adjustments of *partnership items* of 106." (Emphasis added.) And the specific item at issue in this case is 106's own basis in the Canadian dollars that it distributed to its partners. This kind of basis is "inside" basis, not the "outside" basis that was at issue in *Petaluma*. And this is the kind of basis that the regulation defines as a partnership item. See sec. 301.6231(a)(3)–1(c)(3)(iii), Proced. & Admin. Regs. This is a key distinction—*Petaluma* didn't address our jurisdiction over penalties based on adjustments to inside basis.

We also agree with the parties and hold that partner-level proceedings are not necessary to determine the gross-valuation-misstatement penalty in this case: The parties have stipulated that the adjustment to inside basis at the partnership level here allows a numerical adjustment at the partner level and agree that this "is a flow through item to the Palmlunds' individual return." Stip. par. 27. Because it is possible to derive through such an adjustment alone the reduction in the claimed loss on the sale of the Canadian dollars that 106 distributed, and the consequent increase in the reportable gain and resulting deficiency—all without any need for an affected-item deficiency notice, see *Petaluma*, 135 T.C. at 584—we conclude that we do have jurisdiction over the penalty in this partnership-level case after *Petaluma*.[12] Partnership items specifically include "the adjusted basis to the partnership of distributed property." Sec. 301.6231(a)(3)–1(c)(3)(iii), Proced. & Admin. Regs. Under section 6226(f), we

---

[11] Outside basis is an individual partner's basis in his interest in the partnership itself.

[12] "As it is not clear from the opinion, the record, or the arguments before this court that the penalties asserted by the Commissioner and ordered by the Tax Court could have been computed without partner-level proceedings to determine the affected-items questions concerning outside bases, we are unable to uphold the court's determination of the penalty issues. While it may be that some penalties could have been assessed without partner-level computations, we cannot affirm a decision that has not yet been made." *Petaluma FX Partners v. Commissioner*, 591 F.3d 649, 655–56 (D.C. Cir. 2010), affg. in part, revg. in part, vacating in part and remanding on penalty issues 131 T.C. 84 (2008).

have jurisdiction in a TEFRA proceeding to "determine all partnership items * * * and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item." Since the overvalued distribution was a partnership item, the outside basis of individual partners is of no consequence. The only issue in dispute is whether 106 had a section 6664 reasonable-cause-and-good-faith defense for the gross-valuation misstatement.

That leads to the next question: Is the reasonable cause/ good faith defense available at the partnership level? Most courts that have addressed the issue think so. See, e.g., *Am. Boat Co., LLC v. United States*, 583 F.3d 471, 480 (7th Cir. 2009) (court has jurisdiction in partnership-level proceeding to consider partnership defense to accuracy-related penalty); *Fears v. Commissioner*, 129 T.C. 8, 10 (2007) (penalties relating to partnership-item adjustments generally determined at partnership level); *Santa Monica Pictures, LLC v. Commissioner*, T.C. Memo. 2005–104 (reasonable-cause defense a partnership-level determination).

On the other hand, the Court of Federal Claims recently held that the reasonable-cause defense to the gross-valuation misstatement penalty is exclusively a partner-level defense. *Clearmeadow Invs., LLC v. United States*, 87 Fed. Cl. 509, 520–21 (2009). That court interpreted section 301.6221–1(d), Proced. & Admin. Regs., to prohibit the reasonable-cause defense at the partnership level. *Clearmeadow*, 87 Fed. Cl. at 520. The Seventh Circuit disagreed:

To the extent that the court's holding in *Clearmeadow* wholly forecloses a partnership from raising an entity-level reasonable cause defense, we disagree. The court's primary premise is correct: a partner may not raise a partner-level defense during a partnership-level proceeding. But we see nothing that would prevent a partnership from raising its own reasonable cause defense * * *

The *Clearmeadow* court relied on Treasury Regulation § 301.6221–1(d), which defines a partner-level defense * * *. Although the regulation cites § 6664(c)(1) as an example of a partner-level defense, it does not foreclose a similar defense on behalf of the partnership; it only states that "whether *the partner* has met the criteria of * * * section 6664(c)(1)" is a partner-level defense. Treas. Reg. § 301.6221–1(d). The Fifth Circuit concluded that this language did not rule out a partnership-level reasonable cause defense, *see Klamath*, 568 F.3d at 548, and we agree.

[*Am. Boat Co.*, 583 F.3d at 480.]

We find the Seventh Circuit's analysis more persuasive than *Clearmeadow*'s, and hold that 106 may assert the reasonable-cause defense at the partnership level. [13]

## II. *Section 6662 Penalty and Defense*

The gross-valuation-misstatement penalty can be rebutted by a showing of reasonable cause and good faith, sec. 6664(c), and a taxpayer will often argue (as Palmlund does) that he had reasonable cause and showed good faith by relying on professional advice. The regulation somewhat unhelpfully states that reliance on professional advice is "reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Sec. 1.6664–4(b)(1), Income Tax Regs. The caselaw more helpfully points to three factors to test whether a taxpayer properly relied on professional advice. *Neonatology Associates, P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002).

• First, was the adviser a competent professional who had sufficient expertise to justify reliance?

• Second, did the taxpayer provide necessary and accurate information to the adviser?

• Third, did the taxpayer actually rely in good faith on the adviser's judgment?

### A. *Expertise of Professional Advisers*

Both Garza and Turner & Stone were licensed and would have appeared competent to a layman at the time they prepared the return. They would have appeared competent especially to Palmlund, since Garza had been his personal attorney for 20 years, and Turner & Stone had prepared his returns for about 18 years, all without incident. The Commissioner doesn't dispute their expertise in his brief, and so we have no trouble finding these advisers to have at least an adequate level of expertise.

---

[13] The parties have stipulated that only the gross-valuation misstatement penalty for 106 is at issue, so we do not decide whether other penalties (e.g., negligence) require analyzing adjustments to outside basis or other partner-level facts.

B. *Provision of Necessary and Accurate Information*

We also find that Palmlund provided both Garza and Turner & Stone with all the relevant financial data needed to assess the correct level of income tax. See sec. 1.6664–4(c)(1)(i), Income Tax Regs. The Commissioner doesn't dispute this either.

C. *Actual Reliance in Good Faith*

It's the third point—the issue of Palmlund's actual good-faith reliance on Garza's, and Turner & Stone's, professional advice—that's in dispute. There are at least three factors to consider:
- Palmlund's business sophistication and experience,
- the sloppy opinion letter, and
- whether Garza and Turner & Stone were promoters.

Palmlund's business sophistication and experience tend to make it harder to believe he didn't know the transaction was improper. Even though he wasn't a tax expert and was accustomed to relying on professional advisers for tax preparation, it seems doubtful that he acted in good faith in light of his "experience, knowledge, and education." See sec. 1.6664–4(b)(1), Income Tax Regs.

The mistake-ridden opinion letter is problematic as well. The opinion didn't accurately describe the transaction in this case, and the actual transaction was different from the generic transaction described in the opinion in some key respects. We don't, however, always take a close look at opinion letters when penalties are at issue. See, e.g., *Estate of Goldman v. Commissioner*, 112 T.C. 317, 324 (1999) (opinion letter mentioned, but not scrutinized), affd. without published opinion sub nom. *Schutter v. Commissioner*, 242 F.3d 390 (10th Cir. 2000). And the Supreme Court has touched on this issue as well:

To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. * * * "Ordinary business care and prudence" do not demand such actions. [*United States v. Boyle*, 469 U.S. 241, 251 (1985).]

On the other hand, at least one district court found that an opinion letter wasn't good enough only after taking a hard

look at it. *Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122, 205–12 (D. Conn. 2004) (opinion letter wasn't based on all pertinent facts and circumstances and therefore didn't protect against penalties), affd. 150 Fed. Appx. 40 (2d Cir. 2005).

One doesn't need to look very hard to find problems with Garza's opinion. Section 1.6664–4(c)(1)(ii), Income Tax Regs., warns taxpayers against relying on advice that itself unreasonably relies "on the representations, statements, findings, or agreements of the taxpayer." Garza's opinion letter, as we described in our findings of fact, is filled with what appear to be (but which were not in fact) Palmlund's representations. And many of these "representations" just weren't true. Garza shouldn't have relied on them, and it's hard to believe that someone as sophisticated as Palmlund wouldn't at least suspect something was amiss.

And Palmlund also can't rely on Garza or Turner & Stone if they were promoters of the transaction. The caselaw is clear on this point—promoters take the good-faith out of good-faith reliance. See, e.g., *Neonatology Associates*, 115 T.C. at 98. But what exactly makes a tax adviser a promoter has been less than clear. A frequently cited promoter-reliance case explains that "advice must generally be from a competent and independent advisor unburdened with a conflict of interest and not from promoters of the investment." *Mortensen v. Commissioner*, 440 F.3d 375, 387 (6th Cir. 2006), affg. T.C. Memo. 2004–279. But this merely tells us what a promoter is not, not what a promoter is.

*Tigers Eye Trading, LLC v. Commissioner*, T.C. Memo. 2009–121, offers a more workable definition of promoter: "an adviser who participated in structuring the transaction or is otherwise related to, has an interest in, or profits from the transaction." But there's a catch: This definition wasn't relied on or applied to the facts of that case—it's dictum. In *Tigers Eye*, we held only that we had jurisdiction in a partnership-level proceeding to determine whether a tax adviser was a promoter. Since the case was only at the summary-judgment stage, we left for another day the question of whether the tax adviser there actually was a promoter. *Id.* Still, the definition

of "promoter" in that opinion was carefully crafted after considering relevant precedent. [14]

One might need to be careful in applying the definition to some kinds of transactions—a tax lawyer asked by a businessman for advice on how to sell the family business through a tax-favored stock redemption might be said to have "participated in structuring the transaction"—but when the transaction involved is the same tax shelter offered to numerous parties, the definition is workable. As we observed in *Countryside Ltd. Pship. v. Commissioner*, 132 T.C. 347, 352–55 (2009), a tax adviser is not a "promoter" of a transaction when he

- has a long-term and continual relationship with his client;
- does not give unsolicited advice regarding the tax shelter;
- advises only within his field of expertise (and not because of his regular involvement in the transaction being scrutinized);
- follows his regular course of conduct in rendering his advice; and
- has no stake in the transaction besides what he bills at his regular hourly rate.

We therefore adopt the *Tigers Eye* definition for cases like this one, and apply it to Garza and Turner & Stone.

We find that both these advisers not only participated in structuring the transaction, but arranged the entire deal. Garza set up the LLCs, provided a copy of the opinion letter, and coordinated the deal from start to finish. And both Garza and Turner & Stone profited from selling the transaction to

---

[14] *Tigers Eye Trading, LLC v. Commissioner*, T.C. Memo. 2009–121, drew from the following cases for its definition of promoter: *Goldman v. Commissioner*, 39 F.3d 402, 408 (2d Cir. 1994) (taxpayer could not reasonably rely on professional advice of someone known to be burdened with an inherent conflict of interest—a sales representative of transaction), affg. T.C. Memo. 1993–480; *Pasternak v. Commissioner*, 990 F.2d 893, 903 (6th Cir. 1993) (reliance on promoters or their agents is unreasonable because such persons are not independent of the investment), affg. *Donahue v. Commissioner*, T.C. Memo. 1991–181; *Illes v. Commissioner*, 982 F.2d 163, 166 (6th Cir. 1992) (finding negligence where taxpayer relied on person with financial interest in the venture), affg. T.C. Memo. 1991–449; see also *Hansen v. Commissioner*, 471 F.3d 1021, 1031 (9th Cir. 2006) ("a taxpayer cannot negate the negligence penalty through reliance on a transaction's promoters or on other advisors who have a conflict of interest"), affg. T.C. Memo. 2004–269; *Van Scoten v. Commissioner*, 439 F.3d 1243, 1253 (10th Cir. 2006) ("To be reasonable, the professional adviser cannot be directly affiliated with the promoter; instead, he must be more independent"), affg. T.C. Memo. 2004–275; *Barlow v. Commissioner*, 301 F.3d 714, 723 (6th Cir. 2002) ("courts have found that a taxpayer is negligent if he puts his faith in a scheme that, on its face, offers improbably high tax advantages, without obtaining an objective, independent opinion on its validity"), affg. T.C. Memo. 2000–339.

numerous clients. Garza charged a flat fee for implementing it and wouldn't have been compensated at all if Palmlund decided not to go through with it. He wasn't being paid to evaluate the deal or tweak a real business deal to increase its tax advantages; he was being paid to make it happen. And Turner & Stone charged $8,000 for preparing Palmlund's tax returns—$6,500 more than usual. The extra fees were not attributable to an extraordinarily complex return—Palmlund's returns were always complex due to his various business interests—but, we find, were the firm's cut for helping to make the deal happen. Because Palmlund's advisers structured the transaction and profited from its implementation, they are promoters. Palmlund therefore could not rely on their advice in good faith.

Even if the promoter issue was not in the picture, Palmlund would still have failed to establish his good-faith reliance. Palmlund's conversation with Denson—his private banker—also negates a finding of such reliance. It doesn't show good faith to enter into a "tax strategy" with the intent to "lose money." We find Denson to be credible. And his testimony, combined with the sloppy opinion letter and Palmlund's unusual level of "experience, knowledge, and education", demonstrates Palmlund's lack of good-faith reliance. See sec. 1.6664–4(b)(1), Income Tax Regs.

*Decision will be entered for respondent.*