T.C. Memo. 2011-156

UNITED STATES TAX COURT

RONALD V. AND DONNA-KAY SWANSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 30714-08.                    Filed July 5, 2011.

R determined tax deficiencies and accuracy-related
penalties pursuant to sec. 6662(a), I.R.C., for Ps' 2001
through 2007 tax years.  The determinations stem from R's
determination that P-H made excess contributions to his Roth
individual retirement account (Roth IRA).  The parties
stipulated Ps' tax deficiencies for the 2001 through 2006
tax years and R conceded all adjustments relating to the
2007 tax year, leaving only the accuracy-related penalties
for Ps' 2001 through 2006 tax years in dispute.

<u>Held</u>:  Ps' are liable for sec. 6662(a), I.R.C.,
accuracy-related penalties for their 2001 through 2006 tax
years.

<u>Howard S. Fisher</u>, for petitioners.

<u>Michael W. Tan</u> and <u>Cindy Park</u>, for respondent

MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge:  This case is before the Court on a petition for redetermination of respondent's determination in a notice of deficiency that petitioners owe tax deficiencies and section 6662(a) accuracy-related penalties for their 2001 through 2007 tax years.[1]  After concessions,[2] the sole issue left for decision is whether petitioners are liable for section 6662(a) accuracy-related penalties for their 2001 through 2006 tax years.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulations, with the accompanying exhibits, are incorporated herein by this reference.  At the time they filed their petition with this Court, petitioners resided in Nevada.

Petitioners filed joint Federal income tax returns for all relevant years.  This case stems from petitioner husband Ronald V. Swanson's attempt to "turn an IRA into a Roth IRA" (Roth

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]The parties stipulated that petitioners are liable for excise tax deficiencies of $61,277.78, $45,207.79, $58,564.58, $63,774.17, $65,637.06, and $73,911.11 for their 2001, 2002, 2003, 2004, 2005, and 2006 tax years, respectively.  The parties further stipulated that petitioners have no excise or income tax deficiency for their 2007 tax year and are not liable for the accuracy-related penalty for their 2007 tax year.

restructure).[3]  The Roth restructure was designed and implemented by A. Blair Stover, Jr. (Mr. Stover) and his colleagues at the accounting firm of Grant Thornton, LLP (Grant Thornton).  The parties have stipulated that in 2000 Mr. Swanson made an excess contribution into a Roth individual retirement account (Roth IRA) of $1.61 million and that as of December 31, 2006, it remains in his account.

## I.  Petitioners' Background

Petitioner wife, Donna-Kay Swanson, was a homemaker for all tax years in issue and relied on her husband to determine whether to engage in the Roth restructure.  Mr. Swanson attended college at the University of Michigan where he graduated with a degree in mechanical engineering and mathematics.  After graduation, Mr. Swanson began working for Hughes Aircraft (Hughes).  Mr. Swanson worked for Hughes or one of its subsidiaries for his entire 36-year career.

While working at Hughes, Mr. Swanson attended graduate school at the University of California Los Angeles (UCLA) where

---

[3]The basic tax characteristics of a traditional IRA are (1) deductible contributions, (2) the accrual of tax-free earnings (except with respect to sec. 511 unrelated business income), and (3) the inclusion of distributions in gross income.  See secs. 219(a), 408(a), (d)(1), (e); see also Taproot Admin. Servs., Inc. v. Commissioner, 133 T.C. 202, 206 (2009).  The basic tax characteristics of a Roth IRA are (1) nondeductible contributions, (2) the accrual of tax-free earnings, and (3) the exclusion of qualified distributions from gross income.  See sec. 408A(a), (c)(1), (d)(1), and (2)(A); see also Taproot Admin. Servs., Inc. v. Commissioner, supra at 206.

he graduated with a degree in Applied Mechanics. Additionally, Mr. Swanson finished a 2-year extension course at UCLA, where he received a certificate in business management.

During his career, Mr. Swanson worked at Hughes as a part-time master's fellow and then held positions in various areas of structural engineering. Eventually, he was promoted into administrative management.

In approximately 1997 Mr. Swanson helped develop Hughes Global Services, a 20-person company and eventual subsidiary of Hughes. Mr. Swanson was appointed president of Hughes Global Services, where he stayed until his retirement in October 2001. As an employee of Hughes, Mr. Swanson was the beneficiary of a thrift and savings plan (Hughes TSP) to help with retirement.

## II. Introduction to the Roth Restructure

### A. Initial Introduction

Mr. Swanson initially heard about the Roth restructure from Fred Nardi (Mr. Nardi), a friend and coworker. Mr. Nardi told Mr. Swanson that on the basis of his discussions with other tax professionals, including his tax return preparer, Creal & Mather, he understood they felt that the Roth restructure "was solid".

Mr. Nardi showed Mr. Swanson an unsigned opinion letter from Grant Thornton (Nardi letter) detailing the Roth restructure. Mr. Swanson claimed he relied on the Nardi letter in deciding whether to engage in the Roth restructure. Apparently, the Nardi

letter discussed listed transactions, and because of this, Mr. Swanson looked at the Internal Revenue Service (IRS) Web site.[4]

In addition to Mr. Nardi, Mr. Swanson also talked with Jim Patton (Mr. Patton) and Bob Mather (Mr. Mather) before contacting Grant Thornton. Mr. Patton is an investment adviser who began advising Mr. Swanson in 2000 and is the only investment adviser Mr. Swanson has ever consulted. Mr. Patton was also of the impression that the Roth restructure "was above board".

Mr. Mather was Mr. Nardi's tax preparer. According to Mr. Swanson, he contacted Mr. Mather, who had other clients doing Roth restructures and apparently did not see any problems with them.

B.    Introduction to Mr. Stover

In approximately March 2000 Mr. Stover met Mr. Swanson while he was on vacation in Las Vegas. Mr. Swanson asked Mr. Stover

---

[4]A listed transaction is a transaction that is the same as, or substantially similar to, one of the types of transactions that the IRS has determined to be used for tax avoidance and has identified by notice, regulation, or other form of published guidance as a listed transaction. See McGehee Family Clinic, P.A. v. Commissioner, T.C. Memo. 2010-202 (citing sec. 6707A(c)(2); sec. 1.6011-4, Income Tax Regs. (incorporating by reference sec. 1.6011-4T(b)(2), Temporary Income Tax Regs., 65 Fed. Reg. 11207 (Mar. 2, 2000)); see also BLAK Invs. v. Commissioner, 133 T.C. 431, 440-441 (2009)). Sec. 6707A became effective Oct. 23, 2004, and imposed penalties on those who failed to report a reportable transaction as required under sec. 6011. Sec. 6707 entitled "Failure to Furnish Information Regarding Tax Shelter" was effective through Oct. 22, 2004, and imposed penalties on those who failed to register a tax shelter under sec. 6111(a).

several questions, claiming his basic concern was that he "did not want to do anything illegal". Mr. Stover explained the Roth restructure in detail and told Mr. Swanson that the transaction was not only legal but had been "court tested".[5]

After deciding to engage in the Roth restructure, Mr. Swanson met with Mr. Stover on other occasions, again inquiring at one or more of these meetings about the legality of the Roth restructure and whether it was a listed transaction. He also visited the IRS Web site and concluded the Roth restructure was not a listed transaction.

C.   Engagement Letter

On April 11, 2000, Mr. Swanson executed an engagement letter with Grant Thornton. The engagement letter contained a clause providing that Grant Thornton would represent and defend Mr. Swanson or any related entity at no additional cost in case of audit by the IRS. The engagement letter also contained an indemnity clause providing that Grant Thornton would reimburse and indemnify the Swansons and any related entity for any civil negligence or fraud penalty assessed against them by Federal or State tax authorities.

---

[5]Mr. Stover told Mr. Swanson that the Roth restructure had been approved in Swanson v. Commissioner, 106 T.C. 76, 78-81 (1996). The names are coincidental--the taxpayer in Swanson v. Commissioner, supra, has no connection with petitioners. Mr. Swanson read the case and thought that it was very similar to what Mr. Stover was proposing for him.

Petitioners paid $120,000 for the Roth restructure, the engagement letter providing that the fee was to be split equally between Grant Thornton and Nevada Corp. Associations (NCA), a law firm. Mr. Swanson assumed NCA was an "outside legal firm providing services to Grant Thornton".

Mr. Swanson did not ask for a formal opinion letter, nor was one ever issued. Mr. Swanson believed that since he and Mr. Nardi were engaging in the same transaction, he did not need his own opinion letter.

D. <u>Kruse Mennillo and Individuals Other Than Mr. Stover</u>

In addition to Mr. Stover, Mr. Swanson had contact with other individuals at Grant Thornton, including Luther Oliver, a tax lawyer, and Ruth Donovan, a certified public accountant. In September 2001 Mr. Stover, along with other individuals he worked with, left Grant Thornton for Kruse Mennillo, LLP (Kruse Mennillo), another accounting firm. Neither party presented evidence explaining the reason behind Mr. Stover's abrupt move. At the time Mr. Stover left Grant Thornton, Mr. Swanson began using Kruse Mennillo instead of Grant Thornton.[6]

---

[6]Petitioners request that we take judicial notice of a Feb. 21, 2008, Department of Justice Press Release and a Complaint for Permanent Injunction against Mr. Stover filed Feb. 21, 2008. This Court shall grant petitioners' request and has taken judicial notice of the documents requested and <u>United States v. Stover</u>, 731 F. Supp. 2d 887, 914-915 (W.D. Mo. 2010), holding that Mr. Stover had reason to know that various structures he promoted lacked any legitimate business purpose and granting injunctive relief against him. The case focused on "three

(continued...)

E.    Independent Advice and Knowledge

Despite the remarkable promised tax benefits of converting taxable IRA distributions to nontaxable Roth IRA distributions, Mr. Swanson did not ask anyone who was completely independent of the Mr. Patton and Mr. Stover groups for an opinion on the viability of the Roth restructure.  Mr. Swanson knew that there were contribution limits to Roth IRAs, specifically that in 2000 the contribution limit was $2,000.

III. The Roth Restructure

Before the years in issue and before petitioners engaged Grant Thornton, Mr. Swanson had opened a traditional IRA with Charles Schwab with an account number ending in 6050 (Schwab IRA).  Grant Thornton (specifically, Mr. Stover) and NCA, oversaw all of the steps in the Roth restructure.  The Roth restructure was implemented as follows:

- March 20, 2000--A corporation, Sierra West Global Holdings, Inc. (Sierra West), was created by NCA.  It then joined Northstar Acquisition and Investment Co., Inc. (Northstar), also formed by NCA sometime in the first 6 months of 2000.  Sierra West and Northstar shared the same registered agent and registered office during all relevant periods.  Mr. Swanson served as president, secretary, and treasurer of both corporations during 2000 and 2001.  At some point, a James Hoeppner began serving as president and secretary of Sierra West, but acted as Mr. Swanson's nominee when doing

---

[6](...continued)
multiple business entity structures sold and arranged by" Mr. Stover.  The third structure, referred to by the district court as the Roth/S structure "[skirted] the contribution limits applicable to Roth IRAs."  Id. at 900.

so. Each corporation opened a bank account with an initial deposit of $250 on May 4, 2000.[7]

- April 25, 2000--On or around April 25, 2000, Mr. Swanson opened a Roth IRA account with First Union with an account number ending in 0381 (FU Roth IRA).

- April 28, 2000--On or around April 28, 2000, Mr. Swanson opened a Self-Directed Traditional IRA at the First Trust Company of Onaga with an account number ending 0500 (FNBO IRA). On May 5, 2000, the FNBO IRA was funded via a rollover of $1,207,802.55 from the Hughes TSP. On May 19, 2000, Mr. Swanson directed the FNBO IRA to purchase 100 percent of the stock of Sierra West for $1,207,802.55. The purchase price was deposited into the Sierra West account on May 19, 2000.

- May 1, 2000--On or around May 1, 2000, Mr. Swanson opened a Self-Directed Roth IRA at the George K. Baum Trust Company with an account number ending in 8305 (Baum Roth IRA) which was funded with a $2,000 contribution from a personal investment account Mr. Swanson maintained at Charles Schwab (CS Investment Account). On May 2, 2000, Mr. Swanson directed the Baum Roth IRA to purchase 100 percent of the stock of Northstar for $2,000. The purchase price was deposited into the Northstar account on June 6, 2000.

- May 16, 2000--Mr. Swanson deposited $150,000 into the Northstar account from the CS Investment Account. On May 22, 2000, Mr. Swanson ordered $1,087,802.55 transferred from the Sierra West account to the Northstar account. On May 22, 2000, Mr. Swanson ordered $1,238,000 transferred from the Northstar account to the Baum Roth IRA under the guise of a dividend declaration.[8]

---

[7]For 2000 and 2001 Sierra West filed Forms 1120, U.S. Corporation Income Tax Return, reporting zero gross receipts, it had no employees and only nominal expenses, and because it saw no need did not maintain books and records. For 2000 through 2007 Northstar filed Forms 1120 showing zero gross receipts, it had no employees and only nominal expenses, and saw no reason to maintain books or records. The claimed intention was for Mr. Swanson to eventually perform consulting services through Northstar after his retirement, but because of health reasons, he never did.

[8]The transfer was not a dividend because it did not come from Northstar's earnings and profits. The $1,238,000 can

(continued...)

- June 8, 2000--Mr. Swanson wired $250,000 into the Northstar account from the CS Investment Account.  On June 9, 2000, Mr. Swanson ordered $252,000 transferred from the Northstar account to the Baum Roth IRA.[9]

- December 19, 2000--Mr. Swanson deposited $120,000 into the Northstar account from a brokerage account under the name Muchestly, Inc., that Mr. Swanson maintained at Charles Schwab.  On December 29, 2000, Mr. Swanson ordered $120,000 transferred from the Northstar account to the Baum Roth IRA.[10]

- January 8, 2001--By January 8, 2001, $1,238,000, $252,000, and $120,000, for a total of $1,610,000, had been transferred into the Baum Roth IRA and from there had been transferred to the FU Roth IRA and invested in various mutual funds.  As of December 31, 2001, the fair market value of the FU Roth IRA was $1,021,296.28.

- December 2001--Merger documents were executed merging Sierra West into Northstar, with Northstar being the surviving corporation.

- December 2002--The fair market value of the FU Roth IRA as of December 31, 2002, was $753,463.24.  As of December 31, 2003, the fair market value was $976,078.04.  As of December 31, 2004, the fair market value was $1,062,902.79.

- May 2005--All securities held in the FU Roth IRA were transferred to a Roth IRA Mr. Swanson opened with H&R Block Financial Advisors (H&R Roth IRA).

------

[8](...continued) apparently be traced to (1) $197.45 from the initial $250 capital contribution; (2) a $150,000 transfer from Mr. Swanson's brokerage account on May 16, 2000; and (3) a $1,087,802.55 transfer from Sierra West on May 22, 2000.

[9]The $252,000 transfer was made via another purported June 8, 2000, dividend declaration; however, once again the transfer was not a dividend because it did not come from Northstar's earnings and profits.  The transfer may be traced to (1) a $2,000 initial Roth IRA contribution and (2) a $250,000 transfer from Mr. Swanson's brokerage account on June 8, 2000.

[10]The $120,000 transfer was yet again made as a purported dividend but the transfer was also not a dividend because it did not come from Northstar's earnings and profits.

- December 2005--By December 2005 all securities transferred from the FU Roth IRA to the H&R Roth IRA had been liquidated and invested in annuities at Lincoln National Life Insurance Co., also known as American Legacy (American Legacy Annuity). The fair market value of the H&R Roth IRA as of December 31, 2005, was $1,093,951.07. The fair market value of the H&R Roth IRA as of December 31, 2006, was $1,231,851.75.

- December 2007--Mr. Swanson surrendered the American Legacy Annuity and withdrew substantially all the funds from his H&R Roth IRA.

IV. Reporting the Roth Restructure

With the exception of 1 or 2 years, Mr. Swanson prepared his and Mrs. Swanson's joint tax returns for 1965 through 1998.[11] While Mr. Swanson had no formal study in taxation, he did "buy a tax book each year to look at the highlights and see if there [was] anything that was new that would affect" him.

As part of the fee Mr. Swanson paid for the Roth restructure, Grant Thornton began preparing the Swansons' tax returns in 1999. This was because Mr. Swanson indicated he "wanted to make sure that the people that had developed the [Roth restructure] * * * continually followed it and knew exactly what they should be doing". Kruse Mennillo prepared the Swansons' tax returns beginning in 2001.[12]

_____

[11]During the period Mr. Swanson prepared his own return, it consisted of a Form 1040, U.S. Individual Income Tax Return; Schedule A, Itemized Deductions; and Schedule D, Capital Gains and Losses.

[12]The tax returns included Federal income tax returns and Federal excise tax returns. Northstar's 2000 tax return was prepared by Grant Thornton, and Northstar's 2001 through 2007 tax
<span style="float:right">(continued...)</span>

In order to facilitate the preparation of the returns, Mr. Swanson would provide the information and copies of pertinent documents asked for each year by either Grant Thornton or Kruse Mennillo. Individuals including Mr. Stover, Mr. Oliver, and Ms. Donovan presumably worked on the returns. None of these individuals testified.

When Mr. Swanson received the returns, he reviewed them to make sure that all the information he had given was transcribed properly, that the deductions that were taken were proper, and that each of the corporate entities had a tax return. Petitioners' tax returns showed excise tax on excess contributions to a Roth IRA of $2,000 for the 2000, 2001, 2002, 2003, and 2007 tax years; $3,500 for the 2004 tax year; and $5000 for the 2005 and 2006 tax years.

V.   The Result of the Roth Restructure and Audit

As a result of the Roth restructure, Mr. Swanson made an excess contribution of $1,610,000 into his Baum Roth IRA through three different transfers occurring in 2000.

In 2004 Grant Thornton sent Mr. Swanson a letter regarding the Roth restructure (Grant Thornton letter) stating that the Roth restructure was potentially a listed transaction pursuant to IRS

_____

[12](...continued)
returns were prepared by Kruse Menillo. Sierra West's 2000 tax return was prepared by Grant Thornton, and its 2001 tax return was prepared by Kruse Menillo. Even though the tax returns were prepared by different firms, they were prepared by the same team of people.

Notice 2004-8, 2004-1 C.B. 333.  Notice 2004-8, entitled "Abusive Roth IRA Transactions", states, in part, that taxpayers are using transactions "to avoid the limitations on contributions to Roth IRAs" and that "these transactions, as well as substantially similar transaction" are listed transactions.  The transactions described in Notice 2004-8, supra, involve the taxpayer, a Roth IRA, and a corporation substantially all the shares of which are owned or acquired by the Roth IRA.

Mr. Swanson asserts that he discussed the Grant Thornton letter with tax lawyers at Kruse Mennillo, including Mr. Stover, and was told that his transaction was not covered by the notice, he would not be penalized for nondisclosure, and that it was up to him whether he disclosed.  Mr. Swanson did not discuss the Grant Thornton letter or attempt to discern whether he had engaged in a listed transaction with anyone else.  Mr. Swanson decided to disclose the transaction anyway "just to make sure * * * [he] wasn't violating anything * * * [and because he wanted to take] the safest route".  To disclose, Mr. Swanson attached a Form 8886, Reportable Transaction Disclosure Statement, to Northstar's 2003, 2004, and 2006 tax returns.[13]

_____

[13]While Mr. Swanson explained that Form 8886 was used to disclose his Roth restructure, this Court notes that there was little explanation on Form 8886.  Under the Facts section of the form, petitioners typed "THE TAXPAYER WAS FORMED TO PERFORM SERVICES FOR MULTIPLE BUSINESSES IN THE FIELD OF CONSULTING.  THE BUSINESS REASONS FOR ITS EXISTENCE INCLUDE, BUT ARE NOT LIMITED TO:  ASSET PROTECTION, SUCCESSION PLANNING, AND RETIREMENT

(continued...)

In 2006 the Swansons' returns were audited by the California Franchise Tax Board. According to Mr. Swanson, this was the first time that he suspected that the Roth restructure was not 100 percent viable. Mr. Stover and his colleague, Marc Sommers, indicated to Mr. Swanson that their opinion was "that the audit would not show any shortcoming of taxes paid". The audit was concluded in 2007 with "no change". Mr. Swanson "felt that the clearance by the California Tax Board was a further indication that the structure was viable and proper".

The Swansons timely filed Forms 1040, U.S. Individual Income Tax Return, and Forms 5329, Additional Taxes on Qualified Plans (Including IRAs) and Other Tax-Favored Accounts, for all years in issue. On October 6, 2008, respondent issued three notices of deficiency collectively showing the following deficiencies and section 6662(a) accuracy-related penalties:

---

[13](...continued)
PLANNING. THIS PROTECTIVE DISCLOSURE IS BEING FILED BECAUSE IT IS NOT CLEAR WHETHER THE GOVERNMENT WOULD VIEW THE TRANSACTION AS SUBSTANTIALLY SIMILAR TO THOSE IDENTIFIED IN NOTICE 2004-8". In the Expected Tax Benefits section, Mr. Swanson typed "THE POTENTIAL BENEFIT IF ANY COULD BE EITHER A TAX SAVINGS OR COST DEPENDING ON THE TAXPAYERS RATE".

| Tax Year | Deficiency | Penalty Sec. 6662(a) |
|----------|------------|----------------------|
| 2001 | $96,495 | $19,299.00 |
| 2002 | 96,111 | 19,222.20 |
| 2003 | 96,091 | 19,218.20 |
| 2004 | 95,984 | 19,196.80 |
| 2005 | 95,879 | 19,175.80 |
| 2006 | 95,863 | 19,172.60 |
| 2007 | 614,627 | 122,925.40 |

The deficiencies for tax years 2001 through 2006 were excise tax deficiencies based upon respondent's determination that Mr. Swanson had made an excess contribution of $1.61 million to his Roth IRA in 2000 and a portion of the excess contribution remained in the account through December 31, 2006. The deficiency for 2007 was an income tax deficiency based upon respondent's determination that Mr. Swanson had unreported income of $1,803,900 and a computational adjustment of $3,168 to itemized deductions. The Swansons timely petitioned this Court. A trial was held on March 5, 2010, in Los Angeles, California.

OPINION

I. Burden of Proof

We first address the Swansons' contention that the burden of proof has shifted to respondent. They contend that

> Where a petitioner has introduced credible evidence relevant
> to ascertaining the petitioner's liability, the burden of
> proof in court proceedings shifts so that the Service has the
> burden of proof with respect to factual issues related to
> income tax issues (Code Section 7491). The Petitioner in

this case had introduced the requisite credible evidence, an [sic] had maintained all of the required records, and cooperated during the audit process with the Service. Hence, in this proceeding the burden had shifted to the Respondent.

Petitioner has confused the burden of proof for penalties, see sec. 7491(c), with the burden of proof for income tax liability, see sec. 7491(a). Pursuant to section 7491(a), the burden of proof on factual issues that affect the taxpayer's income and estate or gift tax liability (imposed by subtitles A and B of title 26 United States Code) may shift to the Commissioner in certain circumstances. There is no underlying income, estate, or gift tax liability at issue. Accordingly, section 7491(a) is not applicable.

Under section 7491(c), respondent bears the burden of production with respect to Mr. Swanson's liability for the section 6662(a) accuracy-related penalty. This means that respondent "must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty." See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). However, respondent does not have the additional burden of producing evidence of reasonable cause, good faith, substantial authority, or lack of willful neglect, except as may be necessary to rebut evidence introduced by petitioners. See id.

II. Analysis

Section 6662(a) imposes an accuracy-related penalty of 20 percent on any underpayment of tax that is attributable to causes

specified in subsection (b). Respondent asserts negligence or disregard of the rules and regulations as the justification for the imposition of the penalty. See sec. 6662(b)(1). More specifically, respondent urges that Mr. Swanson was negligent in failing to report his excess contributions to a Roth IRA for the 2001 through 2006 tax years.

"[N]egligence", for this purpose, is "any failure to make a reasonable attempt to comply with the provisions of * * * [the Internal Revenue Code]".[14] Sec. 6662(c). Under caselaw, "'Negligence is a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Freytag v. Commissioner, 89 T.C. 849, 887 (1987) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. on this issue 43 T.C. 168 (1964) and T.C. Memo. 1964-299), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). "Negligence is "strongly indicated" when '[a] taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit, or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances.'" Hansen v. Commissioner, 471 F.3d 1021, 1029 (9th Cir. 2006), affg. T.C. Memo. 2004-269; sec. 1.6662-3(b)(1)(ii), Income Tax Regs.

---

[14]Disregard of the rules and regulations "includes any careless, reckless, or intentional disregard of rules or regulations." Sec. 1.6662-3(b)(2), Income Tax Regs.

In determining a taxpayer's liability for a negligence penalty, courts generally look both to whether the underlying investment was legitimate and whether the taxpayer exercised due care in the position taken on the return.  Sacks v. Commissioner, 82 F.3d 918, 920 (9th Cir. 1996), affg. T.C. Memo. 1994-217.  When an investment has such obviously suspect tax claims as to put a reasonable taxpayer under a duty of inquiry, a good faith investigation of the underlying viability, financial structure, and economics of the investment is required.  Roberson v. Commissioner, T.C. Memo. 1996-335, affd. without published opinion 142 F.3d 435 (6th Cir. 1998); see also Mortensen v. Commissioner, 440 F.3d 375, 386-387 (6th Cir. 2006), affg. T.C. Memo. 2004-279; Pasternak v. Commissioner, 990 F.2d 893, 903 (6th Cir. 1993), affg. Donahue v. Commissioner, T.C. Memo. 1991-181 (stating "A reasonably prudent person would have asked a qualified tax adviser if this windfall was not too good to be true"), affd. without published opinion 959 F.2d 234 (6th Cir. 1992).

Petitioners' education and experience with business and financial decisionmaking will be considered in determining whether they were negligent in blindly accepting the advice of adviser promoters who charged large fees.  Respondent has introduced sufficient evidence that Mr. Swanson negligently failed to report excess contributions to his Roth IRA and therefore has met his

burden of production with regards to the section 6662(a) accuracy-related penalty.

III. <u>Reasonable Cause Exception</u>

There is an exception to the section 6662(a) penalty when a taxpayer can demonstrate:  (1) Reasonable cause for the underpayment and (2) that the taxpayer acted in good faith with respect to the underpayment.  Sec. 6664(c)(1); sec. 1.6664-4(a), Income Tax Regs.  Regulations promulgated under section 6664(c) provide that the determination of reasonable cause and good faith "is made on a case-by-case basis, taking into account all pertinent facts and circumstances."  Sec. 1.6664-4(b)(1), Income Tax Regs.

Mr. Swanson bears the burden of proving that he meets the reasonable cause and good faith exception.  He asserts that he meets it because he:  (1) Investigated the Roth restructure before engaging in it; (2) read and relied on <u>Swanson v. Commissioner</u>, 106 T.C. 76 (1996); (3) consulted with numerous people including accountants and tax attorneys; and (4) received a "no-change" letter after his returns were audited by the State of California.

To begin, we do not determine whether Mr. Swanson's alleged reliance on the "no-change" letter issued by the State of California helps to establish reasonable cause and good faith.  Importantly, the issues in this case are the accuracy-related penalties for his 2001 through 2006 tax years, the 2007 year

having already been conceded by respondent in full.  According to Mr. Swanson's testimony, he received the "no-change" letter in 2007.  That means the "no-change" letter could not have had anything to do with the justification for petitioners' failure to act properly with the tax years 2001 through 2005.  We recognize that Mr. Swanson's 2006 tax return could have been timely filed in 2007 after the receipt of the "no-change" letter.  But, Mr. Swanson never provided any evidence as to exactly when in 2007 he received the "no-change" letter or filed the joint Federal income tax return and attached Form 5329.  Further, by failing to introduce the "no-change" letter into evidence, Mr. Swanson has failed to provide this Court with proof as to the exact issues California audited and its reasons for concluding the audit with a "no-change" letter.

We now turn the Swansons' asserted reliance on Swanson v. Commissioner, supra.  Mr. Swanson states that the Swanson case "approved the holding of 100% of the stock of a company by a pension".  While the Court in Swanson did implicitly approve the holding of stock by an IRA, that was not the central issue in Swanson.  Swanson v. Commissioner, supra at 87-90.  Rather the Court was called upon to determine whether the IRS was substantially justified in its litigation position in order to determine whether the taxpayer was entitled to an award of reasonable litigation costs.

We cannot find that the Swansons' claimed reliance on the Swanson decision was reasonable. The issue and facts of Swanson are easily distinguishable from the transaction Mr. Swanson engaged in. Respondent is not contending that an IRA cannot own stock, rather that Mr. Swanson made excess contributions to his Roth IRA. Importantly, there is no evidence other than Mr. Swanson's testimony that he ever even read the case or personally analyzed it as opposed to simply taking Mr. Stover's word for what it held. See, e.g., Hansen v. Commissioner, 471 F.3d at 1032 (noting that even though the taxpayer read a previous decision, there was no evidence that the taxpayer understood or relied on the decision independently of what the promoter told the taxpayer the decision meant).

Next, we turn to the Swansons' argument that they relied on Mr. Stover and other professionals. To support this argument, petitioners cite United States v. Boyle, 469 U.S. 241 (1985); Haywood Lumber & Mining Co. v. Commissioner, 178 F.2d 769 (2d Cir. 1950), modifying 12 T.C. 735 (1949); Orient Inv. & Fin. Co., Inc. v. Commissioner, 166 F.2d 601 (D.C. Cir. 1948); and Hatfried, Inc. v. Commissioner, 162 F.2d 628 (3d Cir. 1947).

While good faith reliance on professional advice based on all the facts may, in many cases, provide a basis for a reasonable cause defense, it is not absolute. Freytag v. Commissioner, 89

T.C. at 888; LaPlante v. Commissioner, T.C. Memo. 2009-226; sec. 1.6664-4(b)(1), Income Tax Regs.

> [F]or a taxpayer to rely reasonably upon advice so as possibly to negate a section 6662(a) accuracy-related penalty determined by the Commissioner, the taxpayer must prove * * * that the taxpayer meets each requirement of the following three-prong test: (1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. * * *

Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002); see also Charlotte's Office Boutique, Inc. v. Commissioner, 425 F.3d 1203, 1212 n.8 (9th Cir. 2005) (quoting with approval the above three-prong test), affg. 121 T.C. 89 (2003).

The general rule in the Court of Appeals for the Ninth Circuit, to which this case would be appealable absent a stipulation to the contrary, is that "a taxpayer cannot negate the negligence penalty through reliance on a transaction's promoters or on other advisors who have a conflict of interest."[15] Hansen v. Commissioner, supra at 1031; see also LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991). "Courts

---

[15]This Court has held that a promoter is "an adviser who participated in structuring the transaction or is otherwise related to, has an interest in, or profits from the transaction." 106 Ltd. v. Commissioner, 136 T.C. 67, 79 (2011); Tigers Eye Trading, LLC v. Commissioner, T.C. Memo. 2009-121.

have repeatedly held that it is unreasonable for a taxpayer to rely on a tax adviser actively involved in planning the transaction and tainted by an inherent conflict of interest". Canal Corp. v. Commissioner, 135 T.C. 199, 218 (2010).

At a minimum, Mr. Stover and his colleagues had a conflict of interest and were not independent.[16]  Mr. Stover set up the various entities and coordinated the deal "from start to finish".  106 Ltd. v. Commissioner, 136 T.C. 67, 80 (2011).  Grant Thornton and Mr. Stover were paid "a flat fee for implementing * * * [the Roth restructure] and wouldn't have been compensated at all if * * * [Mr. Swanson] decided not to go through with it."  See id. Therefore, petitioners cannot argue that their reliance on Mr. Stover and his colleagues establishes reasonable cause and good faith.  See Hansen v. Commissioner, supra at 1027 (affirming Tax Court holding when taxpayers relied solely on the organization promoting the transaction and did not independently verify their tax returns despite warnings by the IRS); see also LaVerne v. Commissioner, supra at 652.

_____

[16]Independence distinguishes the case at hand from those Mr. Swanson attempts to rely on.  In Haywood Lumber & Mining Co. v. Commissioner, 178 F.2d 769 (2d Cir. 1950), modifying 12 T.C. 735 (1949), Orient Inv. & Fin. Co., Inc. v. Commissioner, 166 F.2d 601 (D.C. Cir. 1948), and Hatfried, Inc. v. Commissioner, 162 F.2d 628 (3d Cir. 1947), there is no evidence that the tax advisers who the taxpayers relied on in the cases were not independent.  Haywood Lumber & Mining Co. v. Commissioner, supra at 770-771; Orient Inv. & Fin. Co., Inc. v. Commissioner, supra at 602-603; Hatfried, Inc. v. Commissioner, supra at 631-632.

While Mr. Swanson argues that he also relied on Mr. Nardi, Mr. Patton, and Mr. Mather, there is no evidence, other than Mr. Swanson's testimony, that he talked with these three individuals nor what they talked about and the advice he received.[17]  Neither Mr. Nardi nor Mr. Patton is competent in tax matters.  While Mr. Swanson testified that Mr. Mather was a tax preparer, there is no evidence he is competent in complicated tax matters.

Mr. Swanson appears to believe that his own self-serving testimony is enough to establish reasonable cause and good faith. We disagree.  We have "found reliance to be unreasonable where a taxpayer claimed to have relied upon an independent adviser because the adviser either did not testify or testified too vaguely to convince us that the taxpayer was reasonable in relying on the adviser's advice".  Swanson v. Commissioner, T.C. Memo. 2009-31; see also Heller v. Commissioner, T.C. Memo. 2008-232 (noting in upholding a penalty based on negligence that aside from the taxpayer's "self-serving testimony, there * * * [was] no evidence in the record as to the specific nature of * * * [the professional's] advice"), affd. 403 Fed. Appx. 152 (9th Cir. 2010).  Petitioners' failure to introduce evidence "which, if

_____

[17]Mr. Swanson also appears to rely on individuals who signed his individual and corporate tax returns such as Angela K. Parker, Kelly Murphy, Duanette Thompson, Ruth Donovan, and Kelly Webb.  There is no evidence that Mr. or Mrs. Swanson ever spoke with any of these individuals or if so, what was discussed.  In any event, they also have conflicts of interest because they worked with Mr. Stover on the Roth restructure and were employees of Grant Thornton and/or Kruse Mennillo.

true, would be favorable to * * * [them], gives rise to the presumption that if produced it would be unfavorable." <u>Wichita Terminal Elevator Co. v. Commissioner</u>, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Petitioners must surely have realized that the deal was too good to be true. See <u>LaVerne v. Commissioner</u>, <u>supra</u> at 652-653. Mr. Swanson is a successful businessman who knew that there were contribution limits to Roth IRAs and who had bought a tax book each year he prepared his own tax return. His sophistication is further evidenced in a memo and November 9, 2000, followup memo he wrote to Mr. Stover and Ms. Donovan where he listed the topics he wanted to discuss with them at a June 30, 2000, meeting, including stock options, tax avoidance strategies, avoidance of California taxes, and future deposits and rollovers of his Roth IRA.

IV. <u>Conclusion</u>

Mr. Swanson had doubts, repeatedly asking whether the Roth restructure was legal. Yet, despite these doubts, he never asked for a written opinion letter or sought the advice of an independent adviser, even after receiving a letter from Grant Thornton warning him that he may have engaged in a listed transaction and receiving notice that his returns were being audited by the State of California.[18] Petitioners have failed to

---

[18]We further note that Mr. Swanson was made aware of Notice 2004-8, which is entitled "Abusive Roth IRA Transactions" and described transactions designed "to avoid the limitations on

(continued...)

establish that they meet the reasonable cause and good faith exception to the section 6662(a) accuracy-related penalty. Therefore, we sustain respondent's imposition of section 6662(a) accuracy-related penalties for petitioners' 2001 through 2006 tax years.

The Court has considered all of petitioner's contentions, arguments, requests, and statements.  To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

Decision will be entered

under Rule 155.

---

[18](...continued) contributions to Roth IRAs".  The notice stated that the transactions described in the notice "as well as substantially similar transactions" were listed transactions and required disclosure.  We find it notable that Mr. Swanson continued to rely on Mr. Stover and related tax advisers and did not seek independent advice after being notified not only of Notice 2004-8 but also that his returns were being audited by the State of California.  See Neely v. United States, 775 F.2d 1092, 1095 (9th Cir. 1985) ("Reasonable inquiry as to the legality of the tax plan is required, including the procurement of independent legal advice when it is common knowledge that the plan is questionable.").